Carmen C. **GOMEZ**, Elena Faz, Luis Carrasco, Pablo Carrasco, Jeronimo Carrasco, Jr., Ricardo Carrasco Individually and Guadalupe R. Carrasco Individually and as Representative of the Estate of Jeronimo Carrasco, Appellants,

v.

**TRI CITY COMMUNITY HOSPITAL, LTD.** d/b/a Tri–City Community Hospital, Appellee.

No. 04–98–00613–CV.

Court of Appeals of Texas, San Antonio.

May 19, 1999.

Rehearing Overruled July 6, 1999.

Demetrio Duarte, Jr., Demetrio Duarte, Jr. and Associates, P.C., San Antonio, for appellant.

Cynthia Day Grimes, Ruth Greenfield Malinas, Brendan K. McBride, Ball & Weed, P.C., San Antonio, for appellee.

Sitting: PHIL HARDBERGER, Chief Justice, CATHERINE STONE, Justice and SARAH B. DUNCAN, Justice.

## OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

Appellants appeal a summary judgment in favor of appellee, Tri City Community Hospital, Ltd. ("Hospital"), in a medical malpractice action. The trial court granted a no-evidence summary judgment on the element of causation. Appellants assert that the trial court erred in granting the judgment. We reverse the trial court's judgment and remand the cause to the trial court for trial.

### FACTUAL AND PROCEDURAL HISTORY

On April 20, 1995, Jeronimo Carrasco ("Carrasco") was taken to the emergency room of the Hospital by ambulance complaining of back pain. He was admitted for observation, then released on April 21, 1995. He was still complaining of back pain at the time of his release.

On April 22, 1995, Carrasco returned to the Hospital complaining of continued back pain and the inability to stand. Carrasco further complained that he had not had a bowel movement in four days. A chest x-ray was taken on April 22, 1995. The x-ray revealed a "significantly widened mediastinum" and "an increase in the size of the cardiac silhouette."

On April 24, 1995, a radiologist reviewed the x-ray and dictated his report. In addition to reporting what the x-ray revealed, the report stated: "In the setting of back pain consideration should be given for aortic dissection." The report states: "Ward notified 4–24–95."

Sometime on April 24, 1995, Carrasco's condition deteriorated, and he was air lifted to Methodist Hospital in San Antonio. A CT scan revealed a type I dissecting aneurysm of the thoracic aorta. Carrasco underwent emergency surgery, and the surgeons found a ruptured dissecting aneurysm of the thoracic aorta. The surgeons were able to replace the ascending aorta with a synthetic graft, and the patient was fairly stable following the surgery. The following day, Carrasco suffered another pericardial effusion with tamponade. Emergency surgery was undertaken, and a new bleeding site into the pericardium was found with "abundant blood" in the left chest. Resuscitative efforts were not successful, and Carrasco died.

Appellants sued the Hospital and the emergency room physician. The appellants settled with the physician. The Hospital filed a motion for summary judgment asserting several grounds. The trial court's judgment reflects that the Hospital advised the trial court at the hearing on its motion that it was waiving all summary judgment claims except its "no-evidence" claim. The no-evidence claim contained within the Hospital's motion asserts that appellants failed to present any evidence of proximate cause between the Hospital's alleged breach of the standard of care and appellants' injuries. The trial court granted summary judgment on this ground, and appellants timely perfected this appeal.

### STANDARD OF REVIEW

■ We apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.—San Antonio 1998, pet. denied); Judge David Hittner & Lynne Liberato, *No–Evidence Summary Judgments Under the New Rule, in* STATE BAR OF TEXAS PROF. DEV. PROGRAM, 20 ADVANCED CIVIL TRIAL COURSE D, D–5 (1997). We look at the evidence in the light most favorable to the respondent against whom the summary judgment was rendered, disregarding all contrary evidence and inferences. *Moore*, 981 S.W.2d at 269; *Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997), *cert. denied*, 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). A no-evidence summary judgment is improperly granted if the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact. *Moore*, 981 S.W.2d at 269; TEX.R. CIV. P. 166a(i). Less than a scintilla of evidence exists when the evidence is "so weak as to do no more than create a mere surmise or suspicion" of a fact. *Kindred v. Con/ Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Havner*, 953 S.W.2d at 711.

### EVIDENCE BEFORE THE TRIAL COURT

■ The parties initially disagree regarding the evidence that was before the trial court. The appellants contend that the deposition testimony of Dr. Leah Raye Mabry, Diana Benad, and Dr. Raymond G. Armstrong was before the trial court based on the appellants' notice of intention to use evidence not on file. The Hospital responds that the deposition testimony was not before the trial court because the appellants failed to file the discovery materials referenced in their notice prior to the trial court's hearing. We agree with the Hospital.

Rule 166a(d) permits discovery products not on file with the clerk to be used as summary judgment evidence if a notice containing specific references to the discovery is filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs at least seven days before the hearing if such proofs are to be used to oppose the summary judgment. TEX.R. CIV. P. 166a(d). The comment to the rule states that such proofs must be filed in

advance of the hearing in accordance with rule 166a. Tex.R. Civ. P. 166a cmt.1990. At least two courts of appeals have refused to consider such proofs if the appellate record did not demonstrate that the evidence was filed with the trial court when the trial court's order on the motion for summary judgment was entered. *See Salmon v. Miller,* 958 S.W.2d 424, 427–29 (Tex.App.—Texarkana 1997, pet. denied); *E.B. Smith Co. v. U.S. Fidelity & Guar. Co.,* 850 S.W.2d 621, 623–24 (Tex.App.—Corpus Christi 1993, writ denied); *see also* Timothy Patton, Summary Judgments in Texas § 6.04[1], at 74–75 & Supp. 46–49 (2d ed. 1995 & Supp.1998); *but see Grainger v. Western Cas. Life Ins. Co.,* 930 S.W.2d 609, 613–14 (Tex.App.—Houston [1st Dist.] 1996, writ denied) (holding failure to object to method by which party submitted copies of excerpts waived party's failure to file proofs with trial court). We agree with the reasoning of the Texarkana and Corpus Christi courts of appeals and hold that the deposition testimony was not properly before the trial court for consideration.

### Evidence of Proximate Causation

■ Having determined that the deposition testimony was not properly before the trial court, the only evidence the trial court could consider was the affidavits and medical records attached to the appellants' response to the Hospital's motion for summary judgment. We must now determine whether that evidence constituted more than a scintilla of probative evidence sufficient to raise a genuine issue of material fact as to the proximate cause element of the appellants' cause of action.

In their petition, the appellants allege that the Hospital administered care that fell below the proper standard of care by failing to properly record Carrasco's complaints and failing to timely report the results from the x-ray taken April 22, 1995. In its motion for summary judgment, the Hospital asserted that the appellants had failed to produce any evidence

that these alleged actions proximately caused Carrasco's death. The appellants filed a response to which two affidavits of Comer Roger Youmans, Jr., M.D. were attached, together with the medical records from the Hospital.

In his affidavits, Dr. Youmans asserts that Carrasco's chance for success would be significantly better (greater than 90% to less than 50%) if the dissecting aneurysm was operated on under an elective basis as opposed to a post-rupture emergent basis. Dr. Youmans states: "There is no doubt that Mr. Carrasco would have a better chance for survival if the diagnosis of the dissecting aneurysm had been established on April 22, or even two days previously when he was seen in the emergency room on April 20. . . . It is further apparent from the review that although the x-ray report was not dictated until April 24, 1995, there was no attempt by the hospital personnel to convey what should have been emergency type information to the attending physicians on the day of admission." Dr. Youmans expresses his opinion that the Hospital "had the responsibility of seeing to it that the reports of the grossly abnormal chest x-rays were conveyed to the attending physician on an emergent basis."

The Hospital states in its brief that Dr. Youmans does not explain what the missing "emergency type information" was in his affidavit. If the reference to the "emergency type information" in Dr. Youmans' affidavit is read in context, however, it is clear that Dr. Youmans was referring to the results of the x-ray. In addition, the Hospital states that the affidavits do not suggest that the failure to properly diagnose the patient was the result of the failure to convey the emergency type information or that the attending physician would have made the correct diagnosis with the information. Since the x-ray report states: "In the setting of back pain consideration should be given for aortic dissection," and since the diagnosis that led to Carrasco's surgery was a dissecting

aneurysm of the thoracic aorta, this is some evidence that the x-ray report would have led the attending physician to a correct diagnosis. In addition, after noting the Hospital's failure to convey the emergency type information on the day of admission, Dr. Youmans states: "Subsequently, the correct diagnosis apparently was not suspected until the time the patient coded on April 24." This statement links the Hospital's failure to convey the x-ray information with the misdiagnosis. At the very least, the evidence rises to a level that would enable reasonable and fair-minded people to conclude that the absence of the x-ray report caused the improper diagnosis. *Cf. Krishnan v. Garza,* 570 S.W.2d 578, 583 (Tex.Civ.App.—Corpus Christi 1978, no writ) (noting hospital liable for failing to properly review x-rays).

The Hospital further asserts that "unless the aneurysm ruptured after the Hospital received the report, but while there was still time to do something to save the patient, the Hospital could not have caused any injury to the decedent." This statement ignores the appellants' contention, supported by Dr. Youmans' affidavit, that the Hospital had the duty to take steps to ensure that the results of the x-ray were relayed to the attending physician "on the day of admission."[1] Since Carrasco's condition did not deteriorate until April 24, an inference can be made that the rupture occurred sometime on April 24. If the x-ray results had been relayed on April 22, the day of admission, the surgery could have been elective instead of emergent.

## CONCLUSION

Dr. Youmans' affidavit provides more than a scintilla of evidence that the Hospital's failure to ensure that the x-ray was read and relayed to the attending physician on the day of admission was a proximate cause of the appellants' injuries.

The trial court's judgment is reversed, and the cause is remanded for trial.

Dissenting opinion by: SARAH B. DUNCAN, Justice.

DUNCAN, Justice, dissenting.

Like the majority, I conclude the summary judgment record does not encompass the deposition testimony referenced in Gomez' Rule 166a(d), TEX.R. CIV. P., statement of intent. However, unlike the majority, I reach this conclusion because the statement was not accompanied by "a notice containing specific references to the discovery," as expressly required by Rule 166a(d). I would thus leave for another day the broader issue addressed by the majority, that is, whether a complying statement and notice are sufficient, as indicated by the disjunctive "or" in the text of the rule, or whether they must be accompanied by the timely filing of the specifically referenced evidence, as suggested by the comment. Certainly I would not decide this question without carefully considering the rule's history.

However, I must dissent from the majority's judgment. The summary judgment record simply does not contain even a scintilla of evidence tending to establish Tri–City's failure to promptly convey the April 22 x-ray *results* to Dr. Mabry was a "but for" cause of the delay in diagnosing Jeronimo Carrasco's dissecting aneurysm.

As Gomez correctly recognizes in her brief, her appeal requires this court to determine whether the summary judgment record contains some evidence Tri–City's "failure to promptly deliver the x–ray results of April 22, 1995 to the treating physician proximately cause[d] the death of Jeronimo Carrasco?" In other words, is there some evidence Tri–City's failure to promptly deliver the x–ray results was "a substantial factor in bringing about [Carrasco's death] and without which [his death] would not have occurred." *Kramer*

1. The Hospital did not challenge either the duty or breach elements of the appellants'

claim in the no evidence portion of its motion for summary judgment.

*v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993); *see Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). When considered in light of Gomez' allegations against Tri–City, this burden required Gomez to produce some evidence (1)the delay in correctly diagnosing the dissecting aneurysm was a proximate cause of Carrasco's death, and (2)the delay was itself proximately caused by Tri–City's failure to deliver the April 22 x–ray results to Dr. Mabry promptly on April 22, rather than April 24.

Tri–City properly concedes Gomez produced some evidence Carrasco's death was proximately caused by the delay in correctly diagnosing the dissecting aneurysm. But, Tri–City insists, there is no evidence the delay in diagnosing the dissection aneurysm was proximately caused by its failure to promptly deliver the April 22 x-ray *results* to Dr. Mabry. I agree. Dr. Youmans' affidavits, set forth in the appendix, simply do not address this aspect of the requisite causal link.

Despite this evidentiary void, the majority reverses the summary judgment, stating there is "some evidence that the x-ray *report* would have led the attending physician to a correct diagnosis." Slip op. at 6 (emphasis added). It may be reasonable to infer a correct diagnosis might have followed receipt of the radiologist's report since it expressly stated "consideration should be given for aortic dissection." But Gomez does not contend Tri–City failed to timely convey the *report*, nor could she do so since the report did not exist before April 24. Rather, Gomez alleges Tri City failed to promptly convey the x-ray *results* and, whatever "results" might mean, there is no evidence conveying the *results* would have led Dr. Mabry to a correct diagnosis. Similarly immaterial, in my view, is Dr. Youmans' statement that "the correct diagnosis apparently was not suspected until the time the patient coded on April 24." Nothing in this statement suggests the requisite causal link between Tri–City's "failure to convey the x-ray information" and "the misdiagnosis."

Because Gomez failed to produce some evidence Tri City's failure to promptly convey the April 22 x-ray results was a cause in fact of Carrasco's death, I would affirm the summary judgment and thus dissent from the majority's judgment.

APPENDIX

STATE OF TEXAS

COUNTY OF TRAVIS

AFFIDAVIT

BE IT REMEMBERED that on this 7th day of March, 1997, came before me the undersigned who after having been duly sworn, stated as follows:

My name is Comer Roger Youmans, Jr., M.D. I am a physician who is licensed to practice medicine in the state of Texas. I am board certified in thoracic surgery and in general surgery. I have maintained an active clinical practice of thoracic and cardiovascular surgery for over 30 years. Attached to this affidavit is my curriculum vitae which describes my credentials in more detail.

I have reviewed the medical records concerning the treatment of Jeronimo Carrasco at the Tri-City Community Hospital in Jourdanton, Texas, and the subsequent treatment at Methodist Hospital in San Antonio, Texas. In connection with the treatment received by Mr. Carrasco, it is my opinion that Mr. Carrasco was negligently treated by his health care providers at Tri-City Community Hospital.

The reasons for my stating the same are revealed in review of the records. On April 20, 1995, Mr. Carrasco was taken by ambulance to the emergency room of Tri-City Community Hospital. The patient had been found lying on the ground. At that time he was unable to speak and there was no movement of his left side. The patient had experienced a cerebrovascular accident two years previously. His neurological findings were felt to be related to his old stroke.

Mr. Carrasco was taken to the emergency room of Tri-City Community Hospital. CT scans of the head and spine revealed spinal canal stenosis secondary to degenerative change. Although the nurses notes indicate the patient's back pain was not relieved by the administered pain medication, he was allowed to go home from the hospital the following day on analgesics. The discharge note on April 21, 1995, by Dr. Leah Raye Mabry recorded that the patient's back pain had radiated to his chest.

The following day, April 22, 1995, the patient returned to the hospital complaining of continuing back pain and weakness to the point that he was "now unable to stand." The patient related no bowel movement for four days. There was an abdominal x-ray on admission that revealed "dilated colon to mid sigmoid." Mr. Carrasco was admitted to the hospital with a diagnosis of partial colonic obstruction. He was subjected to a barium enema on

# EXHIBIT "A"

April 24, 1995. An ER nurse's note stated that although the patient received 60 mg of Toradol IM for pain, this shot did not relieve the pain and only "helped some."

A chest x-ray on admission revealed "significant widening of mediastinum" and an increase in the size of the cardiac silhouette compared to an x-ray of 7/28/93. Subsequent chest x-rays confirmed the mediastinal widening and on April 24, 1995, indicated fluid in both pleural spaces.

On April 24, 1995, the patient suddenly deteriorated and a code was called. Dr. John Mulrow performed CPR and recommended transfer of the patient to Methodist Hospital in San Antonio. A left chest tube was inserted, removing bloody fluid.

The patient was transferred to Methodist Hospital via LifeFlight. His blood pressure was 80/0 on admission. It responded to fluids and dopamine.

An echocardiogram at Methodist Hospital revealed a large pericardial effusion. A CT scan revealed a type I dissecting aneurysm of the thoracic aorta.

It should be noted that on April 22, the patient's hematocrit was 39%. On April 24, the hematocrit was 36%. By the time the patient reached Methodist Hospital, the hematocrit was 27%.

The patient was taken for emergency surgery by Dr. Raymond Armstrong. The surgeons found a ruptured dissecting aneurysm of the thoracic aorta. They found 300 cc of blood in the pericardium. There was a diffuse hematoma over the ascending aorta and 1,000 cc of blood in the left chest. Fortunately, this blood had clotted and there was no active bleeding at the time. The aortic valve was found to be normal.

Partly because active bleeding had stopped, the surgeons were able to replace successfully the ascending aorta with a synthetic graft.

The patient was fairly stable the p.m. of surgery. The following day, the patient suddenly had a drop in blood pressure. An echocardiogram confirmed another pericardial effusion with tamponade. The patient's chest was opened in the surgical intensive care unit. A new bleeding site into the pericardium was found with "abundant blood" in the left chest. Resuscitative efforts were not successful and the patient was pronounced dead.

It is well published that the chance for success, including the risk of postoperative bleeding, is significantly better if dissecting aneurysms of the thoracic aorta can be operated on

under an elective basis as opposed to a post rupture emergency basis. There is no doubt that Mr. Carrasco would have had a better chance for survival if the diagnosis of dissecting aneurysm had been established on April 22, or even two days previously when he was seen in the emergency room on April 20.

It seems obvious on review of the records that the attending physicians did not pursue the results of the chest x-ray that was made on the day of the second admission, April 22 1995. It further is apparent from the review that although the x-ray report was not dictated until April 24, 1995, there was no attempt by the hospital personnel to convey what should have been emergency type information to the attending physicians on the day of admission. Subsequently, the correct diagnosis apparently was not suspected until the time the patient coded on April 24.

In connection with the above, it is my opinion that Tri-City Community Hospital had the responsibility of seeing to it that reports of the grossly abnormal chest x-rays were conveyed to the attending physician on an emergent basis. The treating physician, Dr. Leah Raye Mabry, had the responsibility of following up on the results of the chest x-ray and either doing the appropriate studies to establish the emergency diagnosis or immediately transferring the patient to another hospital so that this type of workup could be pursued. It is apparent from the records that more than two days elapsed before this effort was undertaken. The responsibilities were violated and fell below the proper level of care of a patient in Mr. Carrasco's condition in a facility of this type staffed by physicians and personnel of this nature. I am familiar with the medical and surgical treatment necessary to treat individuals such as Mr. Carrasco and I am qualified to make this affidavit.

FURTHER AFFIANT SAYETH NOT.

_____
C. Roger Youmans, Jr., M.D.

SUBSCRIBED AND SWORN TO BEFORE ME by C. Roger Youmans, Jr., M.D. this _7_ day of _March_, 1997, to certify which witness my hand and seal of office.

_____
Notary Public In and For the State of Texas

ANN REEVES
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
4-1-2001

STATE OF TEXAS

COUNTY OF TRAVIS

AFFIDAVIT

BE IT REMEMBERED that on this _9_ day of _February_, 1998, came before me the undersigned who after having been duly sworn, stated as follows:

My name is Comer Roger Youmans, Jr., M.D. I am a physician who is licensed to practice medicine in the state of Texas. I am board certified in thoracic surgery and in general surgery. I have maintained an active clinical practice of thoracic and cardiovascular surgery for over 30 years. Attached to this affidavit is my curriculum vitae which describes my credentials in more detail.

As you know, my first affidavit concerning this case was written on March 7, 1997. Having recorded the summary of the case therein, I will refer only to excerpts from that original affidavit in this manuscript.

The additional information I have reviewed was the defendant Leah Raye Mabry, M.D.'s motion for summary judgement and for severance, and the affidavit of Raymond G. Armstrong, M.D., the cardiovascular surgeon who did the repair on the dissecting thoracic aneurysm.

In Dr. Armstrong's affidavit, he noted that at the time the patient was transferred to Southwest Texas Methodist Hospital on April 24, 1995, this patient was a high risk because of his history of smoking, chronic obstructive pulmonary disease, hypertension, renal insufficiency and weakness secondary to a previous CVA (cerebrovascular accident). He did point out that his greatest risk was the type I aortic dissection. Although he did not mention this in his affidavit, the records confirm that the aneurysm had ruptured into the pericardium and into the left chest. Dr. Armstrong did not record one of the most significant factors, the need for vasopressors prior to admission for low blood pressure. Vasopressors do raise the blood pressure but do so by constricting peripheral vessels which compromises blood flow to vital organs.

I would like to point out at this time that this patient had a higher than usual risk for surgery. However, he did not die from smoking or even chronic obstructive pulmonary disease. His hypertension actually was in the process of being controlled in the hospital environment and he ended up with pressures that actually were too low. His kidney function was compromised by the delay but did not cause his death. The weakness secondary to

EXHIBIT "B"

his CVA did not cause his death. This patient expired from recurrent bleeding into the pericardium and into the left chest from which he could not be controlled and resuscitated.

There are some confusing notations in Dr. Armstrong's affidavit. In the first place, he says he clearly visualized the heart and aorta at the time of surgery. I cannot disagree with that point. However, he goes on to say there was no evidence of bleeding from the chest or pericardium at that time. This statement is in conflict with the fact that an echocardiogram was performed before surgery that revealed a significant hemopericardium and a significant amount of blood in the left chest that required insertion of a chest tube. In addition, the OR note specifically records that at the time of surgery, although the bleeding in the left chest appeared to have clotted, 1,000 cc of blood was removed from the left pleural space and 300 cc of blood was removed from the pericardium. There was also a diffuse hematoma over the ascending aorta.

Dr. Armstrong goes on to comment in his affidavit that "The distal end of the aorta showed both the true and false lumens and they were approximated." (The lumen is the channel through the blood vessel or, in this case, two openings through the artery.) I assume here that he meant to say the cut edge of the aorta at the distal anastomosis showed both lumens which were then approximated. Having removed the tear in the intimal lining of the ascending aorta by resection and replacement with a Hemashield graft, approximation of the two main layers of the blood vessel distally would produce any residual distal false channel with a very low blood pressure and flow if there was any flow at all. From this set up it is very unlikely that a second rupture at a more distal site would occur in less than 24 hours after the first operation.

As the records indicate, the patient's blood pressure began to fall overnight requiring more vasopressors. An echocardiogram revealed a recurrence of his pericardial fluid collection and probable cardiac tamponade. Cardiac tamponade results from fluid, (e.g. blood) in the pericardial sac around the heart to cause pressure on the heart and affect filling and function of the heart. Cardiac arrest occurred and was treated with open cardiac massage by Dr. Armstrong in the intensive care unit.

Dr. Armstrong goes on to state, "I was able to visually inspect the aorta and site of the graft that was put in place on April 24, 1995, and it was intact and without bleeding at that site." He did go on to state that there was some "new blood" in the left chest. However, he does not state the source of that blood except to surmise in his final paragraph that the blood came from a subsequent downstream rupture of the dissection,

"...a new blowout on the thoracic aorta in an area separate from the initial aneurysm..."

To quote page two, paragraph nine of my first affidavit that was written after a complete review of the medical records, "The patient was fairly stable the p.m. of surgery. The following day the patient suddenly had a drop in blood pressure. An echo-cardiogram confirmed another pericardial effusion with tamponade. The patient's chest was opened in the surgical intensive care unit. A new bleeding site into the pericardium was found with 'abundant' blood in the left chest. Resuscitative efforts were not successful and the patient was pronounced dead."

Dr. Armstrong has supposed that the new bleeding episode occurred from some site of the dissection distal to where the graft was inserted in the ascending aorta. In the first place, this really is not possible because the significant bleeding could not dissect back into the pericardial sac and produce a tamponade unless the bleeding occurred in the very first portion of the aorta, somewhere in the proximity of the aortic valve (in this case probably from the proximal suture line).

Although he is not certain of the source of the "abundant blood" in the left chest, since Mr. Carrasco had blood in exactly this location during his graft insertion on the previous day, it is not reasonable to assume that he bled from some new site rupture of dissection. The blood in the left chest most probably came from the same source it did the first time, i.e. bleeding from the area of the ascending aorta where the graft was inserted.

Dr. Armstrong further stated, "Delay in the diagnosis did not effect my ability to successfully resect the ascending aorta with the Hemashield graft." If Dr. Armstrong did make this statement, he has discredited his own affidavit by saying something that all thoracic surgeons know not to be true. In my experience, and in the literature, there is absolutely no question that the risk of operating on a dissecting aneurysm as an elective case is much less risky than operating on a dissecting aneurysm that has already ruptured. Just to start with a few of the problems, the bruising of the periaortic area was noted and causes loss of tissue integrity and stimulates nonclotting of bleeders. Rupture of the aorta itself produces changes in the aortic wall that makes surgery more difficult. Development of a cardiac tamponade effects blood flow to all vital organs, including the heart itself, and compromises subsequent therapy. And, the replacement of lost blood products produces coagulopathies which may contribute to extension of the dissection, control of postoperative hemorrhage, and even the development of a subsequent downstream tear at some future date. Hypotension and the need for vasopressors causes vasoconstriction

with reduced blood flow to most organ systems, such as the kidneys. There is no question in my mind that the delay in diagnosing this patient's dissecting aneurysm did produce a significant increase in risk factors and was the primary proximate cause for this patient not surviving his subsequent attempted resection and repair.

Concerning the possibility of a downstream rupture of any residual false lumen, I can say again that such a rupture would not produce the recurrent pericardial tamponade. Although the literature indicates that approximately 30% of patients with dissecting aneurysms do have some additional clinical problem from distal dissection within the first 10 years after surgery, the chance of this aneurysm, having been repaired as described, rupturing the following day in a distal extension would be highly unlikely and against all the concepts of medical probability.

The literature reflects numerous articles comparing the mortality of operating on an elective dissecting aneurysm to one that has already ruptured. For the type I aneurysm described in this case, surgery before rupture carries a mortality of less than 10% with a survival rate of greater than 90%. After the aneurysm has ruptured, the risk doubles and triples and the chance for survival usually is less than 50%.

To be as specific as possible, I would like to address questions you have posed to me.

1. Question--Did the delay result in the patient being weaker and less likely to respond to treatment?

   Answer--No question about it.

2. Question--Was the likelihood of a new tear developing after surgery increased by the delay?

   Answer--Yes, it was.

3. Question--Do you believe Mr. Carrasco's new tear developing and subsequent death were proximately caused by the failure of the defendant doctor and hospital failing to promptly diagnose Mr. Carrasco correctly?

   Answer--No doubt points already listed increased his bleeding ability from which he expired. As I indicated previously, I do not believe Mr. Carrasco developed a new tear in his aorta. My belief is that the bleeding was from the area of repair. Dr. Armstrong noted that there was no bleeding at the time he was doing the open massage on the heart. Perhaps this was because the patient was in cardiac arrest and had no blood pressure.

If we were to go against medical probability and assume this patient did have a more distal rupture the additional exposure of pressures within the false lumen of the aorta would extend the false lumen and increase the chance that he could rupture at a later date.

I am familiar with the medical and surgical treatment necessary to treat individuals such as Mr. Carrasco and I am qualified to make this affidavit.

FURTHER AFFIANT SAYETH NOT.

_____
C. Roger Youmans, Jr., M.D.

SUBSCRIBED AND SWORN TO BEFORE ME by C. Roger Youmans, Jr., M.D. this ___ day of _February_, 1998, to certify which witness my hand and seal of office.

_____
Notary Public In and For the
State of Texas