**WILLOWBROOK FOODS, INC.; Promised Land Foods, Inc.; and Sunday House Foods, Inc., Appellants,**

**v.**

**GRINNELL CORPORATION, Individually and d/b/a Grinnell Fire Protection Systems Company; Range Guard Industries, Inc.; Badger Fire Protection, Inc.; Farm Credit Leasing Services Corporation; Emerson Electric Company, Individually and d/b/a Chromalox, Appellees.**

No. 04–03–00659–CV.

Court of Appeals of Texas, San Antonio.

Aug. 18, 2004.

Rehearing Overruled Sept. 23, 2004.

---

**7.** 131 S.W.3d 497, 500 (Tex.Crim.App.2004).

494

Peter T. Martin, Jerry D. Mason, Tab
H. Keener, Peter T. Martin & Associates,

Dallas, Patrick M. Dooley, Dooley, Hoerster & Sione, L.L.P., Fredericksburg, for appellants.

Edward A. Davis, C. Vernon Hartline, Jr., Larry D. Grayson, Hartline Dacus Dreyer & Kern, L.L.P., Jacquelyn A. Chandler, Thompson, Coe, Cousins & Irons, L.L.P., Robert H. Fugate, Mark J. Dyer, T. King Fifer, Fanning Harper & Martinson, P.C., Dallas, Jeff D. Otto, Jessica L. Mangrum, Wade C. Crosnoe, Thompson, Coe, Cousins, & Irons, L.L.P., David E. Chamberlain, Chamberlain McHaney, Kurt H. Kuhn, Brown McCarroll, L.L.P., Austin, Kevin S. Besetzny, Novoselsky Law Office, Chicago, IL, Carl Robin Teague, San Antonio, Mac Gann, E. Ray Edwards, Gann & Edwards, Patrick D. McVey, Riddell Williams, P.S., Seattle, WA, for appellees.

Sitting ALMA L. LÓPEZ, Chief Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice.

## OPINION

Opinion by SANDEE BRYAN MARION, Justice.

This is an appeal from summary judgments rendered in favor of appellees, the defendants below. The underlying lawsuit was brought by the appellants, Willowbrook Foods, Inc.; Promised Land Foods, Inc.; and Sunday House Foods, Inc. (collectively, "plaintiffs"), for damages resulting from a fire that started in a turkey fryer at a turkey processing plant owned by Sunday House, Inc.[1] The trial court granted the motions and rendered take-nothing judgments in favor of the defendants. We reverse in part the trial court's judgment in favor of Emerson Electric Company, and we affirm the trial court's judgment in all other respects.

## FACTUAL BACKGROUND

Plaintiff Sunday House Foods, Inc. ("Sunday House") operates a turkey processing plant in Fredericksburg, Texas. Sunday House purchased a Foldenaur Model 75–100 Loaf Browner (a turkey fryer) from Peerless Metal Products Corporation ("Peerless"). The fryer included as a component a fire suppression system to smother oil fires that may occur in the unit. Peerless ordered two control panels from Panatrol Corporation, specifying that each panel include one "Chromalox Temperature Controller" and one "Chromalox High Temperature Limit Switch." Panatrol Corporation, in turn, ordered the controllers from Chromolax, which is a division of Emerson Electric Company. Sunday House paid Peerless a down-payment of one third of the purchase price and financed the balance of the purchase price through Farm Credit Leasing Corporation ("FCL") pursuant to a "Lease Agreement."

According to plaintiffs, in either August or September of 1999, a fire originated in a turkey fryer and spread, destroying the building and its contents. Plaintiffs sued, bringing claims for strict liability based on defective design, manufacture, and marketing; breach of warranty; negligence; and violations of the Texas Deceptive Trade Practices Act ("the DTPA"). Plaintiffs alleged the fryer and/or its component parts were manufactured, marketed, sold, leased, installed, and serviced by the following defendants: (1) Emerson Electric Company, individually and doing business

---

1. Sunday House Foods, Inc. is a subsidiary of Promised Land Foods, Inc. Willowbrook Foods, Inc. is the successor in interest to Promised Land Foods, Inc. and Sunday House Foods, Inc. by virtue of a merger.

as Chromalox ("Emerson"); [2] (2) Grinnell Corporation, individually and doing business as Grinnell Fire Protection Systems Company; Range Guard Industries, Inc.; Badger Fire Protection, Inc.; Automatic Sprinkler Corporation of America; Automatic Sprinkler Corporation; Figgie International (collectively, the "Fire Suppression Defendants"); (3) Peerless Metal Products Corporation; Peerless Acquisition Corporation; Peerless Millwright Service; Foldenaur Equipment Corporation (collectively, the "Peerless Defendants"); and (4) FCL. All defendants, except the Peerless Defendants, moved for summary judgment. The trial court granted the motions, without stating its grounds. On appeal, plaintiffs challenge the summary judgments in favor of the various defendants.

### FCL'S SUMMARY JUDGMENT

FCL moved for a traditional summary judgment on plaintiffs' claims of negligence, breach of warranty, and DTPA violations. In its motion for traditional summary judgment, FCL contended it was not liable because it did not design, sell, or market the fryer. FCL also moved for both a no-evidence and a traditional summary judgment on plaintiffs' strict liability claims. FCL's no-evidence motion as to the defective design and marketing claims stated, without elaboration, that plaintiffs failed to produce evidence on each element of these strict liability claims. As to the defective manufacturing claim, FCL asserted plaintiffs failed to produce evidence that the turkey fryer deviated from the

manufacturer's specifications in a way that rendered it unreasonably dangerous or that a manufacturing defect was the producing cause of their damages.

### Strict Liability Claims

■ Plaintiffs do not dispute that FCL did not manufacture, design, or market the fryer. Instead, plaintiffs contend FCL was a "lessor" of the equipment and therefore strictly liable.

■ A defendant is liable in a strict liability action based on proof that it placed the product into the stream of commerce and that the defective product was a producing cause of the plaintiff's damages. See Firestone Steel Prods. Co. v. Barajas, 927 S.W.2d 608, 613 (Tex.1996). In Rourke v. Garza, 530 S.W.2d 794 (Tex. 1975), the Texas Supreme Court extended the doctrine of strict liability to include persons engaged in the business of leasing products to third parties. The Court held, "Where one is engaged in the business of introducing products into the channels of commerce, he will be subject to strict liability for physical harm caused by such products if they are unreasonably dangerous to the user or consumer whether he sells or leases his products." Id. at 800. Thus, as a result of Rourke, the doctrine of strict liability applies to persons engaged in the business of leasing the product in question. However, the plaintiff must show that the defendant placed the product in the stream of commerce. Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374, 375–76 (Tex.1978).[3]

2. Panatrol Corporation ("Panatrol") manufactured the control panels used in the fryer, and consequently Emerson joined Panatrol as a third-party contribution defendant. Panatrol counterclaimed against Emerson for indemnification. Panatrol and Emerson filed cross-motions for summary judgment. The trial court rendered a take-nothing summary

judgment in favor of Emerson, which is the subject of a separate appeal.

3. In Armstrong Rubber Co. v. Urquidez, 570 S.W.2d 374 (Tex.1978), the Court was confronted, for the first time, with the issue of "whether the doctrine of strict liability in tort applies where the product has not entered the stream of commerce and where there has

Plaintiffs ordered the fryer from Peerless Metal Products Corporation and made a partial payment towards its purchase on or about February 11, 1997. Farm Credit Bank of Texas is the financial institution that provided the funds to plaintiffs for the purchase of the turkey fryer. Farm Credit Bank and FCL executed a Servicing Agreement and Lease Agreement ("the Servicing Agreement"), pursuant to which Farm Credit Bank agreed to provide 100% of the funds to plaintiffs for the purchase of the fryer. In the Servicing Agreement, Farm Credit Bank is named the lessor and FCL the "servicer." The agreement states that Farm Credit Bank, as lessor, "intends to be the owner" of the equipment, but "desires to have Servicer service the Lease [between FCL and plaintiffs]." FCL, in turn, acted as Farm Credit Bank's agent in executing a Lease Agreement with plaintiffs. Under this agreement, FCL is named as lessor and plaintiff, Sunday House, is named as lessee. Plaintiffs repaid Farm Credit Bank in the form of rent payments to FCL; the payments included an interest charge. FCL then remitted the rental payments to Farm Credit Bank. Under the terms of the Lease Agreement, FCL retained title to the fryer, but plaintiffs were responsible for maintaining insurance on the equipment, payment of taxes, and payment of all maintenance costs. FCL assigned all its rights, title, and interest under the Lease Agreement to Farm Credit Bank. FCL never took possession of the fryer, which instead was delivered directly to plaintiffs. The deal between plaintiffs and FCL closed after the fryer was installed.

No Texas court has directly addressed whether strict liability should be extended to entities that provide financing to equipment purchasers in the form of lease agreements such as that at issue here. However, two federal courts have considered a similar issue. In facts almost identical to those presented here, the Fifth Circuit, applying Texas law, considered whether a third-party financier could be held strictly liable for injuries suffered by an employee of R.S. Goodman Company when an aerial basket he occupied drew an arc from high voltage transmission lines and burned. *See Cole v. Elliott Equip. Corp.,* 653 F.2d 1031 (5th Cir.1981). The basket was manufactured by Elliott Equipment Corporation and purchased by R.S. Goodman, which selected the equipment, negotiated the specifications and price, and accepted delivery from the manufacturer. *Id.* at 1032–33. Under a "Vehicle Lease," McCullagh Leasing, Inc. provided the funds to R.S. Goodman for the purchase but did not participate in the design or manufacture or in the selection by R.S. Goodman. McCullagh never had possession of the aerial basket; did not have or claim to have expertise or special knowledge about the utility contracting business; and neither acquired nor held for sale or lease equipment such as the aerial basket. McCullagh, a wholly owned subsidiary of Commercial Credit Company, was engaged in business finance. *Id.* at 1033.

At trial, the court concluded that an extension of strict products liability was unwarranted, reasoning that policy considerations which impose strict liability on a commercial lessor "do not apply when the lessor is not marketing or supplying, but is

been no sale of the product by the manufacturer but a bailment for mutual benefit." *Id.* at 375. The Court held that because the product in that case never entered the stream of commerce, the doctrine of strict liability did not apply to its manufacturer. *Id.* at 377.

In so holding, the Court reaffirmed its position that, although strict liability does not depend upon a sale, the defendant must in some manner release the product to the consuming public. *Id.* at 376.

merely a financier whose collateral is the product." *Id.* at 1034. The trial court reasoned that the expediency of calling the agreement a lease, and requiring the "lessee" to secure liability insurance, did not warrant the application of such liability. The court "found that the circumstances surrounding the agreement that Goodman selected the equipment and negotiated the purchase price with Elliott, that McCullagh never saw the equipment and never had the equipment in its actual or constructive possession, that McCullagh had no business dealings with Elliott, and that McCullagh does not hold such equipment for sale or lease strongly militated against application of § 402A [strict products liability]." *Id.* at 1034–35.

On appeal, Cole argued that section 402A should be extended to include financing agreements such as that between McCullagh and R.S. Goodman. Relying on two Texas cases, *Rourke v. Garza* and *Armstrong Rubber Company v. Urquidez,* the Fifth Circuit disagreed, and held that, based on a careful examination of the agreement, the circumstances surrounding its execution, and the policies involved in the application of section 402A to commercial leases, section 402A should not be extended to cover "finance leases." *Id.* at 1035.

In *Abco Metals Corp. v. Equico Lessors, Inc.,* 721 F.2d 583 (7th Cir.1983), the Seventh Circuit addressed the same issue. Applying Illinois law, the Seventh Circuit focused on "the overall role of the alleged tortfeasor in moving the defective product through the chain of production, marketing, and distribution." *Id.* at 584. The pleadings revealed that Equico's role in the overall production, marketing, and distribution of the defective product "was virtually nonexistent," and that Equico "merely furnished the financial means for [the wholesaler, distributor, and manufac-

turer] to consummate their agreement." *Id.* at 585. The court phrased the issue as whether "Equico occupied a relationship to the transaction between Abco and the manufacturer of the defective product such that strict products liability should attach." *Id.* The court concluded that Equico's connection to this transaction, as a "seller" or "lessor," was too remote to give rise to strict products liability under Illinois law:

> After the die was cast concerning the manufacturing arrangements for the machine, Equico entered the transaction, wholly unable to influence or control the prior bargain; and understandably so, because the machine was to be manufactured to Abco's specifications. The inescapable conclusion is that Equico had no input into the production or marketing of this machine. It was not, therefore, in the original chain of distribution and was not a party capable of preventing a defective product from entering the stream of commerce. Any profit it reaped derived from having placed its money, and not the defective product, into the stream of commerce.

*Id.* at 585.

We agree with the reasoning applied by these federal courts, and conclude that the Servicing Agreement and Lease Agreement here merely provided the financial mechanism by which plaintiffs were able to purchase the equipment it sought for its business. Because FCL did not place the fryer into the stream of commerce, it cannot be held strictly liable in this products liability action. Accordingly, FCL conclusively established, as a matter of law, its entitlement to summary judgment on plaintiffs' strict liability claims against it.

**Negligence Claim**

■ Having determined FCL conclusively established that it did nothing more than provide plaintiffs with the funding necessary to purchase the fryer, we next

consider whether FCL owed a legal duty to plaintiffs. Plaintiffs do not complain about the financing transaction; instead, their claims are directed toward an allegedly defective product. In their response to FCL's motion for traditional summary judgment and on appeal, plaintiffs assert a fact issue exists because FCL "may have" received information about the fryer that it did not provide to plaintiffs, and the receipt of such information created a duty. Plaintiffs rely on *Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex.2000), for their argument that "FCL assumed a duty when it provided services under the lease and obtained information not disclosed. FCL had a duty to disclose all relevant information received by them."

■ In *Torrington*, the plaintiffs did not base Torrington's liability upon its status as the manufacturer of a bearing used in a helicopter or upon any control it may have had over the bearing. Instead, plaintiffs asserted that Torrington assumed a duty to investigate and identify defective bearings. Therefore, the Supreme Court analyzed Torrington's liability under the plaintiffs' undertaking theory. The Court noted that "a duty to use reasonable care may arise when a person undertakes to provide services to another, either gratuitously or for compensation." *Id.* at 837. Under these circumstances, one who undertakes, gratuitously or for consideration, to render services to another may be subject to liability if (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) the plaintiff relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiff's risk of harm. *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 323 (1965)).

Here, nothing in the record establishes a fact issue as to whether FCL assumed any duty independent of the Lease Agreement. Nothing in the record supports plaintiffs' contention that FCL actually received information about the fryer. Other than this general allegation that FCL "may have" received product information, plaintiffs point to no evidence of any information received by FCL that was not already in plaintiffs' possession when they decided to purchase the fryer. In their summary judgment response and on appeal, plaintiffs concede the "turkey fryer was purchased at a time significantly prior to the entry of the lease agreement." Plaintiffs do not contend that any information allegedly received by FCL would have caused them to rescind the purchase or that they relied on any investigation by FCL of the turkey fryer when plaintiffs decided to purchase the fryer. Finally, nothing in the record supports a contention that one of the services undertaken by FCL was an investigation of the turkey fryer.

Accordingly, FCL conclusively established, as a matter of law, its entitlement to summary judgment on plaintiffs' negligence claim.[4]

## Breach of Warranty Claims

■ Plaintiffs alleged that FCL's lease breached implied warranties of fitness and merchantability and implied and express warranties. FCL moved for summary judgment on the grounds that the following clause in the Lease Agreement disclaimed all warranties of fitness and merchantability:

---

4. Because we conclude FCL was entitled to summary judgment on plaintiffs' negligence claim, we do not address FCL's alternative arguments that plaintiffs disclaimed any basis for negligence or that it is entitled to indemnification from plaintiffs.

[FCL] is not the manufacturer of the equipment nor the manufacturer's agent nor a dealer therein; the equipment is of a size, design, capacity, description and manufacture selected by [plaintiffs]; [plaintiffs are] satisfied that the equipment is suitable and fit for its purposes; [FCL] does not make any warranty or representation whatsoever, either express or implied, as to the fitness, condition, merchantability, design or operation of the equipment, its fitness for any particular purpose, the quality or capacity of the materials in the equipment or workmanship in the equipment. . . .

■ In their summary judgment response and on appeal, the only argument raised by plaintiffs is that FCL cannot rely on this disclaimer, which is printed in bold capital letters, because disclaimer provisions must be communicated prior to the transaction at issue. Plaintiffs conclude that because the fryer was purchased before the Lease Agreement was executed, the disclaimer is invalid. It is true that a disclaimer must be disclosed to a buyer before the sales contract is completed, unless the buyer later agrees to the disclaimer as a modification of the sales contract. *See Womco, Inc. v. Navistar Int'l Corp.*, 84 S.W.3d 272, 279 (Tex.App.-Tyler 2002, no pet.). "One of the underlying purposes of Texas Business and Commerce Code section 2.316 is to protect a buyer from surprise by permitting the exclusion of implied warranties." *Id.* (citing to Tex. Bus. & Comm.Code § 2.316, cmt 1 (Vernon 1994)). However, the holding in *Womco* is inapplicable to the facts presented here. FCL did not sell the fryer to plaintiffs, and prior to executing the Lease Agreement with FCL, the plaintiffs had already selected the fryer from the seller and made a partial payment toward its purchase. Accordingly, FCL conclusively established, as a matter of law, its entitlement to sum-

mary judgment on plaintiffs' breach of warranty claims.

## DTPA Claims

■ FCL moved for summary judgment on plaintiffs' DTPA claims on three grounds: (1) plaintiffs disclaimed all warranties, (2) plaintiffs are not "consumers" as defined by the DTPA, and (3) FCL lacked knowledge of the equipment's quality. In their response and on appeal, plaintiffs challenge the summary judgment only on the basis that they were not consumers. Where an appellant uses specific points of error to attack a summary judgment and fails to attack one of the possible grounds on which the judgment was granted, the summary judgment must be affirmed. *Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex.1970); *Richardson v. Johnson & Higgins of Tex., Inc.*, 905 S.W.2d 9, 11 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Because plaintiffs failed to challenge FCL's two other grounds for summary judgment on their DTPA claim and because there is no general assignment of error, we may affirm summary judgment on plaintiffs' DTPA claim where it may have been based on a ground not specifically challenged by plaintiffs. For these reasons, we affirm the summary judgment in favor of FCL on plaintiffs' DTPA claims.

## Conclusion

FCL established its entitlement to summary judgment on all of plaintiffs' claims against it. Therefore, the trial court did not err in rendering a take-nothing summary judgment in favor of FCL.

## FIRE SUPPRESSION DEFENDANTS' SUMMARY JUDGMENT

Certain of the Fire Suppression Defendants[5] moved for a traditional summary

---

**5.** The motion for traditional summary judg- ment was jointly filed by all Fire Suppression

judgment on the grounds that they did not design, manufacture, assemble, fabricate, distribute, repair, install, sell, lease, and/or service the turkey fryer and/or its component parts, including the fire suppression system. All of the Fire Suppression Defendants moved for a no-evidence summary judgment on the issue of causation.[6] The trial court granted both motions, without stating its grounds.

## No–Evidence Motion on Causation

■ In their no-evidence motion, the Fire Suppression Defendants argued there was no evidence to show that the loss of the processing plant would have occurred even if the fire suppression system had activated. We review a no-evidence summary judgment de novo, viewing the evidence in the light most favorable to the non-movant and disregarding all evidence and inferences to the contrary. *See Moore v. K Mart Corp.*, 981 S.W.2d 266, 269 (Tex.App.-San Antonio 1998, pet. denied). A party may move for a no-evidence summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX.R. CIV. P. 166a(i). A no-evidence summary judgment motion is improperly granted when the non-movant brings forth more than a scintilla of probative evidence that raises a genuine issue of material fact. *Id.; Gomez v. Tri City Cmty. Hosp., Ltd.*, 4 S.W.3d 281, 283 (Tex. App.-San Antonio 1999, no pet.).

In support of their no-evidence motion, the Fire Suppression Defendants argued that the issue was not what started the fire in the turkey fryer, but instead, the issue was how the fire suppression system failed. In other words, was the fire's escape from the fryer caused by the plaintiffs' conduct or by the defendants' product or conduct? The defendants presented evidence that the turkey fryer was manufactured by Peerless Metal Products and contained a fire suppression system capable of both manual and automatic activation to smother oil fires within the equipment. The Peerless Metal Products Operating Manual, which accompanied the turkey fryer, contained the following instruction:

> Note: there is a pin which must be removed to activate your system. It is clearly tagged, and is located in the control box mounted directly above the 2½ gallon tank. Carefully read information in the literature enclosed in the packet inside the electrical control panel prior to removing this pin!! It is possible a cable adjustment will have to be made prior to removal!

The Fire Suppression Defendants asserted the fire suppression system could not be manually or automatically operated if the pin was not removed.

At trial and on appeal, there is no dispute that the fire suppression system had to be activated in order to suppress any fire that occurred within the turkey fryer. The defendants asserted there was no evidence that plaintiffs inspected, activated, and armed the fire suppression system, and they provided summary judgment evidence that (1) the State Fire Marshall records did not contain the required certification by a fire inspector that the pin had been removed; (2) no evidence existed showing that the Seiler Fire & Equipment Company, which inspected the portable fire extinguishers at the plant, had inspect-

---

Defendants except Range Guard Industries, Inc. and Badger Fire Protection, Inc.

**6.** The Fire Suppression Defendants argued that because causation is an element of all of plaintiffs' causes of action and because no evidence existed on this element, they were entitled to summary judgment on all of plaintiffs' causes of action.

ed or activated the fire suppression system; (3) the Occupational Safety and Health Organization records showed the system had not been inspected and activated; (4) photographs taken three days after the fire showed the pin still in place and other critical parts of the fire suppression system, such as a valve and dip tube, were not in a functioning position; (5) a Seiler employee observed that the fire suppression system had not been activated and the pin was still in place; and (6) in either July or August 1999, this same Seiler employee was told by an employee of the plant that the fire suppression system had not been inspected and activated by a licensed inspector.

The Fire Suppression Defendants concluded that no evidence existed that the fire suppression system had ever been made operational, no evidence existed to show that the loss of the processing plant would have occurred even if the system had been made operational, and plaintiffs' failure to activate the system caused the system's failure to contain the fire.

In response, plaintiffs presented the affidavit of their expert to dispute defendants' contentions. According to plaintiffs' expert, the dislocation of the valve and dip tube was due to heat and pressure occurring during the fire and not due to an error in assembly before the fire. Plaintiffs' expert also stated, "My investigation indicated there was extinguishing agent in the piping. The only way for extinguishing agent to get into the piping is through the valve and out into the piping to the nozzles."

In their reply, the Fire Suppression Defendants submitted deemed admissions, in which plaintiffs are deemed to have admitted the following: (1) they received a copy of the turkey fryer Operating Manual; (2) they read that portion of the Operating Manual instructing users to remove the pin; (3) prior to August 31, 1999, neither they nor anyone performing work at their request activated the automatic fire suppression system on the fryer in accordance with the instructions provided in the Operating Manual; (4) they had scheduled, for the day after the fire occurred, Seiler Fire Equipment Company, Inc. to inspect and remove the pin; (5) prior to the fire, their fire safety representative, Ray Bolero, had scheduled a properly licensed fire inspector to perform an inspection and activation of the fire suppression system; (6) Bolero told OSHA the fire suppression system had not been inspected by a licensed inspector; (7) the fire suppression system did not activate automatically; (8) during the fire, Alonzo Castillo, a supervisor in the smokehouse, attempted to manually activate the fire suppression system by pulling the pin, but the system did not activate; (9) the fire suppression system would have suppressed the fire had it operated automatically and/or manually; (10) they have no document evidencing having paid any company, individual, or entity for the inspection, pin removal, activation, and/or periodic inspections of the fire suppression system; and (11) had the fire suppression system been automatically and/or manually activated, it would have prevented the fire from escaping the turkey fryer. Plaintiffs did not move to have these deemed admissions withdrawn or amended.

 Deemed admissions are competent summary judgment evidence. *State v. Carrillo*, 885 S.W.2d 212, 214 (Tex. App.-San Antonio 1994, no writ). Admissions, once deemed by the court, may not be contradicted by any evidence, including summary judgment affidavits. *See Marshall v. Vise*, 767 S.W.2d 699, 700 (Tex. 1989); *Carrillo*, 885 S.W.2d at 214. Any matter established by way of a request for admissions is conclusively established as to

the party making the admission, unless on motion, it is withdrawn or amended with the permission of the court. *See* TEX.R. CIV. P. 198.2(c), 198.3; *Marshall,* 767 S.W.2d at 700.

■■■■ Admissions can be waived if the party relying upon an opponent's admissions does not object to the introduction of controverting evidence and to the submission of any issue bearing on the facts admitted. *Marshall,* 767 S.W.2d at 700; *Resolution Trust Corp. v. Thurlow,* 820 S.W.2d 51, 53 (Tex.App.-San Antonio 1991, no writ). However, an objection is required only when the offered evidence clearly contradicts the admissions. *See Resolution Trust Corp.,* 820 S.W.2d at 53. In their reply, the Fire Suppression Defendants objected to the affidavit of plaintiffs' expert that contradicted the admissions. The record does not contain a ruling on the objection. Nevertheless, we conclude an objection was not necessary because the evidence offered by plaintiffs in their response did not contradict any of the admissions. More specifically, plaintiffs' expert's statement that "The only way for extinguishing agent to get into the piping is through the valve and out into the piping to the nozzles," does not clearly contradict plaintiffs' judicial admissions that they did not activate the fire suppression system prior to the fire pursuant to the Operating Manual's instructions and, if the system had been activated, it would have prevented the fire from escaping the turkey fryer.

We hold that the Fire Suppression Defendants established their entitlement, as a matter of law, to summary judgment on the element of causation on all of plaintiffs' causes of action. Therefore, the Fire Suppression Defendants were entitled to a take-nothing summary judgment in their favor.

## EMERSON'S SUMMARY JUDGMENT

Emerson moved for summary judgment on the following grounds: (1) there is no evidence of any defect in the two temperature controllers, (2) the controllers did not cause the fire, and (3) plaintiffs lacked standing to assert their DTPA claims and there is no evidence that Emerson made any false, misleading, or deceptive act.

### Strict Liability and Negligence Claims and Causation

■■■ Emerson argues that as a producer of a component part, it cannot be held liable for the defective design, manufacture, or marketing of the turkey fryer as a whole. Emerson also asserts "the physical evidence conclusively establishes that [plaintiffs] cannot prove causation between the controllers and the fire." Emerson's argument is premised on its contention that the temperature controllers had been disconnected prior to the fire and, therefore, could not have caused the fire.

Emerson asserts, and plaintiffs do not dispute, the following: (1) neither Emerson nor Chromalox (a division of Emerson) designed or manufactured the turkey fryer; (2) Chromalox manufactured and sold to Panatrol two Chromalox 2104–RO100 primary temperature controllers and two Chromalox 3901–11104 over-temperature controllers; (3) neither Emerson nor Chromalox participated in the selection of the controllers used in the turkey fryer's control panel; and (4) these four controllers are "off-the-shelf" products that can be purchased through Chromalox's catalogue and over its website. Emerson argues that it is entitled to summary judgment on plaintiffs' strict liability and negligence claims because, as the supplier of a component part, it is not liable for defects in the final product unless the component part is defective. Emerson contends the components parts, its four controllers, are not defective.

Strict liability for component part manufacturers is limited when the component part is integrated into a larger unit before distribution. *Koonce v. Quaker Safety Prods. & Mfg. Co.*, 798 F.2d 700, 715 (5th Cir.1986) (applying Texas law); *see also Davis v. Dresser Indus.*, 800 S.W.2d 369, 370 (Tex.App.-Eastland 1990, writ denied). A component part manufacturer that supplies a product according to a purchaser's specifications is free from strict liability if the component part itself is not defective. *Molina v. Kelco Tool & Die, Inc.*, 904 S.W.2d 857, 861 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Stated another way, if the component part manufacturer does not participate in the design or assembly of the final system or product, it is not liable for defects in the final product if the component part itself is not defective. *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 682 (Tex.2004); *Koonce*, 798 F.2d at 715; *Davis*, 800 S.W.2d at 370.

Emerson contends there is no evidence of any defect in the controllers and, instead, the evidence indicates the controllers' contact relays were open and the controllers performed properly; thus, it is entitled to summary judgment on all of plaintiffs' claims. Although plaintiffs dispute certain of the following factual allegations, according to Emerson the fire's escape from the turkey fryer resulted from the following sequence of events. The turkey fryer was delivered to plaintiffs in March 1998 and for the next year it was operated without incident. In early August 1999, plaintiffs moved the fryer to a new location. After the move, plaintiffs attempted to again operate the fryer, but it failed to heat. A maintenance supervisor inspected the fryer and discovered that the LED readout on the primary temperature controller[7] was displaying an "open sensor" message. This message notifies the operator of the fryer that the controller is not detecting a thermocouple sensor or that the controller needs to be recalibrated. Until the "open sensor" condition is remedied the relay contact for the controller remains open. In this case, the fryer's heating elements could not be energized.

The maintenance supervisor determined that the "open sensor" message meant the controller was not allowing power to flow to the heating elements. To correct the condition, plaintiffs first replaced the primary temperature controller, but this controller also displayed the same "open sensor" message. Plaintiffs ultimately discovered that a pair of wires under the fryer had been severed, probably during the move. The wires were twisted and taped together, clearing the "open sensor" condition. The fryer was tested with water to confirm the heating elements worked, and the fryer was turned off.

On August 31, 1999, the fryer was filled with peanut oil, turned on, and the cooking temperature for the oil set. After about fifteen minutes, an employee noticed that the temperature displayed on the primary controller had risen to only about 100 degrees fahrenheit. Shortly thereafter, the oil began to smoke, then boil, then erupt into flames.

After the fire, the remains of the temperature controllers were examined. According to Emerson, the open position in which the relay contact for the over-temperature controller[8] was found indicates

---

7. According to plaintiffs' expert, when the primary controller operates properly, the contacts close and current is applied to the heaters.

8. According to plaintiffs' expert, if the oil gets too hot, the over-temperature controller will open the contacts and current is removed from the heaters.

this controller performed properly because it was designed to shut off when the thermocouple junction registered the proper temperature or when the power was cut off.

After the fire, the thermocouple wires for the fryer were also examined. These wires exit the bottom of the control panel through a strain relief connector. Immediately below the point at which the wires exited the control panel, the sheathings around the wires had been cut and pulled back, and the four stranded wires in the two thermocouple wire sheaths had been twisted together. According to Emerson, the twisted wires created a thermocouple junction for both controllers, causing the controllers to read the temperature at the new junction rather than the temperature of the cooking oil in the tank. The temperature at the new junction was lower than the temperature of the controllers' preset temperatures, thus, the controllers never interrupted the power to the heating elements, resulting in a "thermal runaway" condition. This condition caused the fryer to heat the cooking oil to its auto-ignition temperature and start the fire.

Plaintiffs do not dispute that the controllers were components of the turkey fryer. However, plaintiffs contend they raised a fact issue sufficient to defeat Emerson's entitlement to a no-evidence summary judgment based on the affidavits of their experts. Plaintiffs presented two affidavits of Michael Pish who stated as follows:

The only two devices which had the capability to initiate the heating process, control and monitor temperature rise to the set point, maintain the temperature within set limits, initiate a shut down at the high temperature set point and initi-

ate safety shut downs due to any failures in the heating or the temperature sensors (thermocouples), were the Chromalox 2104 controller and the 3901 high temperature cutoff controller. These controllers failed to shut off power to the heating elements after a sufficient length of time had lapsed to cause oil to reach ignition temperature. Had such devices shut off electrical power to the heating elements the fire would not have occurred for the reasons stated herein.

. . .

A failure occurred within the controller(s) electronics and resulted in a run away heating process that caused overheating and ignition and spread of the fire from the fryer to the building in which it was located. The failures occurred because the subject 2104 *did not* have the features that the literature indicates and consequently failed to react or the unit *did* have the features and these features failed to operate properly and shut down the heating process. . . .

Plaintiffs also submitted the affidavit of George Wandling, who conceded that post-fire photographs showed "the thermocouple wire bundles twisted together and the copper sheathing on each thermocouple wire bundle damaged." Based on his examination of the location where the two thermocouple bundles were twisted together, Wandling concluded there was "no physical evidence that, prior to the fire, the insulation on the individual iron and constantan stranded wires were damaged, cut, or pulled back, allowing the individual wires to touch, thereby creating a thermocouple junction."[9] Another plaintiffs' expert, Bob Wilbur, stated that moisture can

---

**9.** Emerson objects to this testimony as being "disingenuous" because it contradicts the testimony of one of plaintiffs' employees. This objection goes to the weight of the expert's testimony, and such conflicts between witnesses' testimony is within the jury's province to reconcile.

affect the operation of the temperature controller "and has caused the return of these controllers to the manufacturer at least twice in the past." According to Wilbur, moisture or oil contamination can also affect the thermocouple junction if it is not sealed, and they were not sealed in the photographs he examined.

Another of plaintiffs' experts, Reed McClintock, stated as follows:

> The recreation of the effects of the twisting of the thermocouples wires clearly indicates the flaw in the controller(s) in that the controller(s) have no feature which links the application of power to the fryer heaters with the lack of temperature rise in the oil over time. It further indicates the controller(s) lack of response to damage to the thermocouples which is critical to safe operation of the oil heating process.

Pish and McClintock both noted a variety of failures in the controllers, including failure to control temperature within set limits, cut off power in a temperature overage, limit a run away condition, and control the power to the fryer by comparing the heat applied over time to the increased oil temperature. Both also attested to a variety of failures to warn of conditions that could and did exist in the controllers and that were not part of the owner/operator's manual, such as a failure to warn of the effect of contamination and moisture, that the controllers are not designed to shut down when the sensor fails, and not indicating that the proper thermocouples must be supplied with a thermocouple plug that would match a thermocouple plug on the controller thus eliminating loose wires at terminals and possible shorting and contamination.

We conclude that Emerson's summary judgment evidence did not conclusively establish that it was entitled to summary judgment on plaintiffs' strict liability claims or on the issue of causation, and plaintiffs' summary judgment evidence raised a fact issue sufficient to defeat Emerson's entitlement to a no-evidence summary judgment.

## DTPA Claims

■ Emerson moved for summary judgment on plaintiffs' DTPA claims on the grounds that there is no evidence of any false, misleading, or deceptive act on Emerson's part.[10] In their response to the motion for summary judgment, plaintiffs merely make the general statement that their "summary judgment proof as outlined herein presents questions of fact on issues including but not limited to Emerson's failure to advise or warn Plaintiffs of assessment and proper use of its product."

■ A plaintiff claiming nondisclosure under the DTPA must prove four elements: (1) a failure to disclose information concerning goods or services, (2) which was known at the time of the transaction, (3) if such failure was intended to induce the consumer into a transaction, (4) which the consumer would not have entered had the information been disclosed. TEX. BUS. & COM.CODE ANN. § 17.46(b)(24) (Vernon

---

**10.** Emerson also argued that because this is a subrogation case in which Chubb Insurance Company is the real party in interest, Chubb may not pursue a DTPA claim against it. Emerson did not provide any evidence to establish that Chubb has assets in excess of $25 million or that all of the plaintiffs and Chubb have assets exceeding $25 million. Accordingly, Emerson offered no competent proof in support of its allegation that Chubb was not a "consumer." Finally, on appeal, Emerson argues there is no evidence that plaintiffs relied on any representations or that any representations caused plaintiffs' damages. Emerson did not specifically challenge these two elements of plaintiffs' DTPA claim in its motion for a no-evidence summary judgment; therefore, we do not address this argument on appeal.

2002). Accordingly, Emerson's motion, which states there is no evidence of any false, misleading, or deceptive act, specifically challenges these elements.

 In their affidavits, both Pish and McClintock list six instances of Emerson's failure to make certain "recommendations" or "indications" about its product. For example, plaintiffs allege Emerson did not recommend and use proper thermocouples in a sealed tubing that physically protected the thermocouples from damage, and Emerson failed to indicate the critical effects of sensor contamination. However, mere nondisclosure of material information is not enough to establish an actionable DTPA claim. Nondisclosure without evidence that a defendant had knowledge of the undisclosed information and intentionally withheld the information is insufficient to establish a violation of the DTPA. *Chandler v. Gene Messer Ford, Inc.*, 81 S.W.3d 493, 502 (Tex.App.-Eastland 2002, pet. denied). In order to recover damages under the DTPA for the failure to disclose material information, the plaintiff must also show that the information was withheld with the intent of inducing the consumer to engage in a transaction. *Robbins v. Capozzi*, 100 S.W.3d 18, 26 (Tex.App.-Tyler 2002, no pet.); *Century 21 Real Estate Corp. v. Hometown Real Estate Co.*, 890 S.W.2d 118, 126 (Tex.App.-Texarkana 1994, writ denied). Here, plaintiffs did not meet their burden of bringing forth more than a scintilla of probative evidence that raises a genuine issue of material fact on the elements of their nondisclosure claim. Therefore, Emerson established its entitlement as a matter of law to summary judgment on this claim.

## CONCLUSION

We reverse the trial court's judgment in favor of Emerson on plaintiffs' strict liability and negligence claims and we remand those claims to the trial court for further proceedings. We affirm the trial court's judgment in all other respects.