In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-12-00524-CV
_____

### SUN DEVELOPMENT, L.P., Appellant

### V.

### LARRY HUGHES AND SUSAN HUGHES, Appellees

**On Appeal from the 9th District Court**
**Montgomery County, Texas**
**Trial Cause No. 09-10-10214 CV**

## MEMORANDUM OPINION

This appeal arises from the trial of a case that relates to Sun Development, L.P.'s sale of a new home to Larry and Susan Hughes. After they purchased the home, the Hugheses learned the home needed significant repairs. They then sued Sun, alleging that Sun had breached the parties' agreements and had engaged in deceptive trade practices regarding the sale. At the conclusion of a jury trial, the jury found that Sun had engaged in a deceptive trade practice, and that Sun had

1

breached a Rule 11[1] agreement, which obligated Sun to do several things in return for the Hugheses decision to exercise an option Sun gave them in return for closing on the home. After the trial, the Hugheses elected to recover judgment against Sun under the jury's DTPA findings, as those findings allowed the Hugheses a greater recovery.

In eight issues, Sun appeals from the trial court's judgment. We agree with Sun's argument in its first issue, and hold that the trial court's decision to deny Sun's request to identify the entity that installed the stucco on the home as a responsible third party was error, and we further conclude that the error was harmful. We reverse the trial court's judgment, and we remand the cause for a new trial.

Factual and Procedural Background

After the Hugheses signed a contract to purchase the home, they identified several items that Sun agreed to complete or repair before the date the parties selected to close on the sale. Before the closing date arrived, a dispute arose regarding whether Sun had completed its work. Claiming that all of the items had been substantially repaired, Sun filed a suit for declaratory judgment against the

---

[1]Rule 11 of the Texas Rules of Civil Procedure requires agreements touching "any suit pending" to be in writing, signed, and filed with the papers as part of the record or made in open court to make such agreements enforceable. Tex. R. Civ. P. 11.

Hugheses in Galveston. In its suit, Sun asked the court to declare the rights of the parties under the agreements relating to the home's sale. To resolve the declaratory judgment suit, the Hugheses and Sun signed a letter of agreement in 2008 that gave the Hugheses two alternatives, the right to inspect and close on the home, or the right to cancel their agreement to buy the home. The Rule 11 agreement gave the Hugheses several days after they signed the agreement to inspect the home and decide which of the options they wanted to exercise.

In August 2008, the Hugheses opted under the agreement to close on the home. Under the Rule 11 agreement, given the Hugheses' decision to purchase the home, Sun's builder and Sun were obligated to perform several future acts. For instance, Sun's builder was required to take "care of normal and customary punch list items." Sun was obligated to provide the Hugheses with a "2-10 warranty[,]" to pay the Hugheses $15,000 at closing, and to give them a $12,000 credit for landscaping and irrigation. Sun also agreed in the Rule 11 agreement that it would dismiss its declaratory judgment action, and both parties agreed they would execute mutual releases, which waived "any and all known causes of action that either party could assert against the other arising from the home purchase transaction."

3

Had the Hugheses opted to cancel the sale, the Rule 11 agreement would have required that Sun return the earnest money the Hugheses had paid on the home, that Sun pay the Hugheses $45,000 for the expenses the Hugheses incurred for items they had "purchased and used at the home[,]"and that Sun dismiss its suit for declaratory judgment. Had the cancellation option been selected, the Rule 11 agreement still required both parties to execute mutual releases.

Approximately three months after closing on the home, the Hugheses hired Lynn DeGeorge, a general contractor, consultant, and inspector to inspect the stucco system on their home. DeGeorge holds certifications specific to inspecting homes that are clad in stucco. Although the Hugheses had benefitted from several inspections by inspectors who examined the home before they exercised the option they were given in the Rule 11 to close on the home, none of the inspectors the Hugheses utilized before they closed held certifications specific to inspecting stucco. DeGeorge advised the Hugheses that the stucco on the home needed extensive repair.

In 2009, the Hugheses filed suit against Sun, claiming that Sun had engaged in deceptive trade practices in selling the home and that Sun had breached several terms of the parties' Rule 11 agreement that related to the purchase. The Hugheses' live pleading at the time of the trial, their fourth amended petition, alleges that Sun

4

knowingly failed to disclose information concerning the home's construction with the intent to induce them to purchase the home. The Hugheses also alleged that they would not have purchased the home had Sun fully disclosed information about the home that Sun knew about before the sale closed.

The case was tried to a jury in April 2012. At the conclusion of the trial, the jury found that Sun failed to disclose "information concerning construction services that was known at the time of the transaction with the intention to induce [the Hugheses] into a transaction they otherwise would not have entered into if the information had been disclosed." On appeal, Sun argues that no evidence before the jury shows that it knew, on the date the sale closed, of any problems that it did not disclose. Additionally, Sun argues that the Hugheses relied solely on their own inspections when they closed on the sale, and it argues that the Hugheses did not rely on any of the information that it gave them when they finally decided they wanted to close on the home.

During the trial, the respective home inspection reports obtained by the Hugheses and Sun were admitted into evidence. The reports that each of the parties received are evidentiary of what the parties knew regarding both the type and scope of repairs the home needed at various times as the parties negotiated whether the sale would close. The various reports and bids that Sun received from its

5

inspector and from its contractors were also relevant to the jury's evaluation of whether Sun fully disclosed all it knew about the scope of repairs needed to the stucco on the home.

We will first address the reports the Hugheses obtained from the inspectors they hired. The Hugheses had the benefit of reports from three inspectors who had looked at the home at various times before the sale closed. In 2007, Gordon Guffin inspected the home. Guffin gave the Hugheses a written report regarding his inspection, and his report identified several exterior and interior construction problems that needed to be addressed. The problems that Guffin reported include indoor and outdoor water leaks at various specific locations. The types of problems that Guffin reported, however, were matters the jury could have decided that the builder addressed through repairs before the date that the sale finally closed.

In March 2008, George Guajardo, the owner of a restoration and cleaning company, inspected the home for the Hugheses. Guajardo's thermal image report is among the evidence the jury considered in determining what the Hugheses learned regarding the home's moisture problems before they decided to close on the home. Guajardo's report noted the existence of "possible moisture or improper insulation" in several areas of the home, and he suggested that his company be hired to further investigate the existence of any possible moisture problems by

using a moisture meter to probe the walls in seven areas that his report identifies. There was no testimony at the trial showing that Guajardo's company did any further testing at the home or that he ever confirmed that the home had moisture problems. The jury could have also concluded that the repairs the builder performed after March 2008 and before closing left the Hugheses with the impression that the problems Guajardo had identified in his report were resolved.

In June 2008, the Hugheses hired Gene Montgomery of Island Home Inspections to inspect the home. Montgomery's report includes a punch list, which identifies the items he found in his inspection that he felt needed to be repaired. Montgomery's report does not indicate that he performed any tests to evaluate the moisture levels in the home or that he confirmed that moisture problems still existed at the home. The most significant finding in Montgomery's report notes that the concrete finish on the first floor was substandard. However, the Hugheses never complained at trial that Sun knew and failed to disclose that problem, nor did they complain that Sun knew and failed to disclose the other cosmetic problems that are noted in Montgomery's report. The repairs that Montgomery recommended in his report are largely cosmetic, and none of the repairs Montgomery suggested addressed any of the water or moisture problems that were referred to in Guffin's or Guajardo's reports. Montgomery did note that the air

7

conditioning system in the attic was condensing at an abnormal rate, and he noted that he saw water dripping from the plenum of the air conditioner onto the attic deck. With respect to that issue, Montgomery recommended that the Hugheses have a licensed air conditioning technician inspect the air system. Nevertheless, the jury could have reasonably concluded that Montgomery's report did not disclose any problems regarding the stucco installation, and that it did not indicate that Montgomery identified any problems relating to the presence of excessive moisture in the home's walls. Although there are stucco-related repairs that are referenced in Montgomery's report, the jury could have reasonably viewed the items Montgomery mentioned as items the Hugheses reasonably believed the builder had repaired before closing as they were all cosmetic.

Separately, Sun received two reports from its inspector that it did not share with the Hugheses before the date the sale closed. The jury could have concluded that the undisclosed reports provided Sun with information indicating that the problems with the stucco installation were significant and were not just cosmetic. The two undisclosed reports were authored by Rhondalyn Riley, the president of Exterior Inspections, Inc., who inspected the home at Sun's request. Riley has certifications as a licensed professional real estate inspector through the Texas Real Estate Commission and as a moisture analyst for inspecting exterior insulation

8

finishing systems (stucco) through the Exterior Design Institute,[2] as well as a certification through the Associated Wall and Ceiling Industry.[3] The record reflects that Riley was the only certified stucco inspector who provided reports regarding the stucco on the home prior to closing. After each inspection, she provided Sun with a report addressing the stucco on the home. Riley's first two reports, her March 2008 and her initial June 2008 report, were not disclosed to the Hugheses before they closed on the home. Riley's third and last report of June 26, 2008, which notes that the stucco had undergone repairs and was performing, was the sole report that Sun provided to the Hugheses. The evidence also showed that Sun gave Riley's last report to the Hugheses during the negotiations over the Rule 11 agreement. After receiving Riley's report, and before deciding to exercise the option to close on the home, the evidence did not show that the Hugheses obtained their own certified stucco inspector to inspect the stucco on the home.

Riley's initial report, dated March 2008, states that the purpose of her report was to "help determine potential problem areas which may warrant more investigation." Riley's March report notes that Exterior Inspections was "engaged

---

[2]According to Riley, the Exterior Design Institute is a national certifying body that certifies people to inspect stucco and to test for moisture.

[3]Riley explained that the Associated Wall and Ceiling Industry is another industry organization that provides training and certifications in the inspection of stucco.

to conduct a visual survey of the condition of the stucco cladding and [do] a moisture analysis of the exterior walls[.]" Riley's March report identified high moisture readings at levels of 20% or higher in three specified locations in the home's walls, medium moisture readings at levels of more than 16% but less than 20% in three other walls, and several additional stucco problems that Riley thought were in need of repair. Riley recommended that core sampling be done in areas where moisture levels exceeded 25%, and she also recommended core sampling in areas where there was no sheathing or soft sheathing on the exterior of the home. Although the evidence shows that the Hugheses asked Sun on several occasions before they closed on the home for a copy of Riley's March 2008 report, the evidence shows that Sun did not disclose Riley's March 2008 report before the Hugheses decided to close on the home.

Riley conducted her second stucco inspection on the home on June 9, 2008. Riley's June 9 report notes that some of the deficiencies she found in March had been repaired, but she also notes in her second report that most of the items identified in her first report had not yet been fixed. Riley's June 9 report does not show that she retested the areas previously tested in March. Riley's June 9 report recommends that core sampling be done in those areas where high moisture

readings were found. Sun never gave the Hugheses a copy of Riley's June 9 report before they exercised their option to close on the home.

Riley conducted a third stucco inspection on June 26, 2008, and Sun provided the Hugheses a copy of Riley's June 26 report during the negotiations that led the parties to sign the Rule 11 agreement. Riley's June 26 report specifically mentions that moisture testing equipment was not used during her June 26 inspection. Although Riley's June 26 report mentions that high moisture levels had been found, her June 26 report did not reflect where the high moisture levels were found, information contained in both of her earlier reports. Riley's June 26 report indicates that she was told that core sampling had been done, as it states: "Stucco core samples made, per builder, to investigate high moisture readings[;]" however, none of Riley's reports indicate that Riley personally knew whether core sampling had been done or that she knew what the builder and Sun had found based on any core sampling that was done. Although the builder testified at the trial, he was never asked to address whether he had witnessed any core sampling being done, nor was he asked if he knew what the results of any core sampling had shown. Riley's testimony indicates that during her last June 2009 inspection, she observed signs on the walls of the home that were consistent with someone having

done core sampling in the areas where she had reported high moisture levels to be present.

Sun's corporate witnesses were also relevant to the jury's resolving why Sun might have chosen to provide the Hugheses with only one of Riley's three reports. Sun's President and CEO indicated during his testimony that the purpose of giving the June 26 report to the Hugheses was to show that the stucco on the home met all standards. But, Riley's March report can be viewed as revealing the presence of possible serious and extensive stucco problems, and given Riley's lack of personal knowledge about the repairs, her last report when viewed in isolation, as potentially misleading. Even Riley agreed during trial that a person purchasing the home "[p]erhaps" might have liked to have known that there were very high moisture readings in the locations identified in her March report. Riley testified at the trial that had she been purchasing the home, she would have wanted to know about the moisture problems and the repairs that had been done to address those problems. Also, Riley did not dispute that two of the moisture readings that she reported in her March report "were off the charts." Riley's last report did not disclose the moisture readings, as these were reported in her earlier reports.

While the Hugheses acknowledged during the trial that they knew of various problems with the home at closing, they disputed that Sun disclosed the extent of

12

the moisture problems related to the installation of the stucco on the home or that they were told at closing of the extent of the repairs Sun knew were still needed to fix those problems. Before closing, the Hugheses requested that Stuart Lapp, Sun's counsel, provide the March report to them. Lapp advised the Hugheses' attorney that although he had not seen the March report, he understood the June 26 report that he provided did not identify any problems with the stucco on the home. The evidence shows that Lapp told the Hugheses' attorney during the negotiations that led to the signing of the Rule 11 agreement that "[i]f that is true, I question why you or your clients would feel the need to see a prior report rather than rely on the report they have that reflects no problems with the stucco." At trial, Lapp testified: "In hindsight, I wish that I had found that report and personally given it to them[.]" Lapp also testified that had he disclosed the March report prior to the sale of the home, "we wouldn't be here today." According to the Hugheses, by choosing to disclose only Riley's last report, Sun led them to believe that all of the stucco-related problems had been fixed.

The jury found in the Hugheses' favor on their nondisclosure claim, and found that Sun had knowingly engaged in the conduct at issue. The jury found the Hugheses had actual damages of $647,713 on their DTPA claim, awarded punitive damages of $85,000, and found the Hugheses should recover attorneys' fees from

Sun for the trial and also gave the Hugheses conditional awards of attorneys' fees in the event the case was appealed.

Standard of Review

First, we will address the arguments that Sun has advanced in issues two and three, as if these were resolved in Sun's favor, we would be required to render a judgment in Sun's favor. *See Lone Star Gas Co. v. R.R. Comm'n of Tex.*, 767 S.W.2d 709, 710 (Tex. 1989) (per curiam). In issue two, Sun argues the evidence is legally insufficient to support the jury's DTPA findings. In issue three, Sun argues the evidence before the jury conclusively established that the Hugheses agreed to release all of their claims.

Claims challenging the legal sufficiency of the evidence are characterized as either "'no evidence'" challenges or "'matter of law'" challenges, depending on which party has the burden of proof. *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275 (Tex. App.—Amarillo 1988, writ denied). Because Sun did not have the burden of proof on the DTPA issue, Sun must demonstrate in its appeal that no evidence supports the jury's DTPA findings to prevail on the arguments that it advances in issue two. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983); *Christus St. Mary Hosp. v. O'Banion*, 227 S.W.3d 868, 873 (Tex. App.—Beaumont 2007, pet. denied).

14

With respect to the arguments Sun raises in issue three, which concern the enforcement of the Rule 11 agreement, the law also required the Hugheses to prove that they were entitled to avoid their obligations under the parties' Rule 11 agreement. *See Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990) (explaining that burden of proving that a claim was unknown, once defense of release of known claims is shown and there is evidence that the parties agreed to release known claims, is on the party attempting to avoid the release under a claim of mutual mistake). Although the jury was not asked to specifically resolve an issue that included an instruction about all of the elements relevant to a claim of mutual mistake, we are required to assume the trial court found any of the omitted elements on the question of mutual mistake in a manner that supports the trial court's judgment. *See* Tex. R. Civ. P. 279 (providing that omitted elements of a claim "shall be deemed found by the court in such manner as to support the judgment"); *Tri v. J.T.T.*, 162 S.W.3d 552, 558 (Tex. 2005). In this case, one of the implied findings is that the Hugheses were unaware at the time they exercised their option to close on the home that the various repairs which had been done by the builder were inadequate. *See* Tex. R. Civ. P. 279. Thus, Sun must also demonstrate that there is no evidence supporting the trial court's implied findings to prevail on

15

the arguments it has advanced in issue three. *See Croucher*, 660 S.W.2d at 58; *Raw Hide Oil & Gas*, 766 S.W.2d at 276.

We use an objective standard to evaluate whether the evidence presented to a jury is legally sufficient to support a verdict. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). If the evidence being reviewed allowed reasonable and fair-minded people to reach the verdict being reviewed, the appeals court is required to uphold the judgment. *Id*. In a legal sufficiency review, appellate courts are to "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.; see also Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). A legal sufficiency challenge will be sustained "when, among other things, the evidence offered to establish a vital fact does not exceed a scintilla." *Suberu*, 216 S.W.3d at 793. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Id.* (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

Analysis — Legal Sufficiency Issues

To prevail on a DTPA claim, DTPA plaintiffs are required to show (1) that they were consumers with respect to the purchase at issue; (2) that the defendant engaged in false, misleading, or deceptive acts; and (3) that the defendant's acts

16

were a producing cause of their damages. *See* Tex. Bus. & Com. Code Ann. § 17.50(a) (West 2011); *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 623 (Tex. App.—Fort Worth 2006, pet. denied). In this case, the trial court defined a "'[f]alse, misleading, or deceptive act or practice'" as:

> Failing to disclose information concerning construction services that was known at the time of the transaction with the intention to induce Plaintiffs into a transaction they otherwise would not have entered into if the information had been disclosed.

*See* Tex. Bus. & Com. Code Ann. § 17.46(b)(24) (West 2011).

The Hugheses submitted and prevailed under a failure to disclose claim. Under the DTPA, an actionable failure to disclose a claim requires the plaintiff to show that the defendant knew of the information, that the defendant failed to bring the information to the plaintiff's attention, and that the information was withheld with the intent to induce the consumer to engage in a transaction. *See Doe*, 907 S.W.2d at 479; *Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 507 (Tex. App.—San Antonio 2004, pet. denied). Information is material if a reasonable person would attach importance to it and would be induced to act on it to determine whether to make the transaction in question. *See Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Fort Worth 2004, no pet.).

17

To demonstrate that the nondisclosure of known facts was a producing cause of a plaintiff's DTPA damages, the nondisclosure at issue must be shown to have been a substantial factor that brought about the plaintiff's injury, without which the injury would not have occurred. *See Doe*, 907 S.W.2d at 481. Given the issue submitted to the jury in this case, the jury was required to find that Sun knowingly failed to disclose information concerning Sun's construction services that induced the Hugheses to purchase a home they would not have purchased had such information been disclosed. The primary focus of the trial concerned the Hugheses' stucco-installation claim. With respect to their nondisclosure recovery under that claim, the Hugheses were required to prove that before closing, Sun failed to disclose that it knew the stucco repairs done on the home had not fixed the problems that it had identified before the Hugheses exercised their option to close on the home, and that had those problems about which it knew been disclosed, the Hugheses would not have exercised their option to purchase the home.

The jury in Sun's case considered a variety of alleged nondisclosure claims submitted in a broad form charge. The jury found that Sun failed to disclose information concerning its construction services, that the Hugheses had relied to their detriment on the nondisclosure, and that the nondisclosure of the information was a producing cause of the Hugheses' damages. In issue two, Sun argues that its

18

alleged nondisclosures about the stucco could not have been a producing cause of the Hugheses' damages because there was no evidence supporting the jury's determination that the Hugheses were unaware at closing that the home had stucco problems. But, Sun's argument largely ignores the inferences that a jury could reasonably draw from the evidence, as the evidence, when viewed in the light most favorable to the jury's verdict, allowed the jury to conclude that differences existed in what each of the parties knew regarding what was wrong with the stucco on the home. Sun's argument also ignores the reasonable inference from the evidence tending to show that the parties did not have the same level of knowledge about what had been done to repair the stucco before the Hugheses exercised their option to purchase the home. Additionally, Sun's argument ignores evidence that tends to show the Hugheses were unaware that Sun had received a bid to repair the stucco several times larger than what it spent on repairs.

On the evidence before the jury, the jury could have reasonably concluded that Sun had encouraged the Hugheses to rely on Riley's third report in deciding that the stucco had been adequately repaired, as Sun's representatives presented it as a report indicating that the stucco problems had been fully repaired. Sun agrees that it reached that same conclusion from Riley's third report, and it contends that the jury could not have rejected its claim as unreasonable. But, Sun's argument

19

ignores the other evidence that allowed the jury to infer that it knew the report did not mean the repairs that it paid for were adequate to fix the problems with the stucco on the home, and the repairs that Sun paid to have done to the stucco were largely cosmetic.

For example, Riley's June 26 report states the stucco was performing as intended at that time; the report does not necessarily support Sun's claim that the problems that Riley had identified in her earlier reports had been fully repaired. Essentially, Sun disputes the inferences that reasonable jurors could draw from the conflicting evidence addressing what Sun knew about the stucco and what repairs were needed to the stucco before the sale closed. The evidence demonstrates that both parties learned generally that there had been problems associated with the stucco installation and that both parties were aware that Sun had its builder do something to repair problems with the stucco on the home. However, the evidence also provided the jury with conflicting inferences on whether Sun reasonably believed all of the problems with the stucco were fully repaired by the repairs that it authorized. For example, the jury was entitled to conclude on this record that Sun selectively provided the Hugheses with Riley's June 26 report and that it did not provide them with her earlier reports to mislead them about the nature and extent of the problems with the stucco on the home. The jury could also have reasonably

inferred from all of the evidence that a full disclosure by Sun of what it knew about the stucco problems on the home would have revealed to the Hugheses that the repairs Sun authorized were insufficient to address the scope and extent of the problems identified by Riley in her two undisclosed reports.

Circumstantial evidence also allowed the jury to infer that Sun was aware that the repairs it authorized were insufficient to address the scope of the problems that Riley had identified regarding the installation of the stucco on the home. The evidence before the jury includes evidence showing that before closing, Sun's builder received a bid for repairing the stucco from Robert Territo, the owner of Allstar Stucco. Territo's bid to repair the stucco was based on the problems that Riley noted in her March report, and his bid was substantially more than the amount Sun proved that it paid to address the problems identified by Riley in her reports. According to Territo, he submitted a bid of approximately $100,000 to repair the stucco, a bid that he testified he based on Riley's initial report. During the trial, Territo explained that after giving the initial bid, Sun's builder asked that he revise his bid because he was told that they wanted to "control some of the costs themselves[.]" After providing Sun's builder a revised bid, Territo explained that he "[n]ever heard back from [Sun's builder]." There was evidence that Sun received a copy of Territo's bid, and nothing showed that the Hugheses were aware

before they closed on Territo's bid. Under the circumstances, the jury could have reasonably inferred that Sun was aware that the costs to repair the items identified by Riley would be approximately $100,000. Additionally, at trial Territo testified that during construction, he told Sun's builder there were major defects and flaws in the stucco. Territo testified that the entire stucco system on the home, in his opinion, was flawed from the start. Territo recommended that Sun hire a certified inspector to inspect the home. According to Territo, the home's stucco-related issues at the time of the trial were all due to the original application of stucco.

Sun did not spend anything approaching $100,000 to repair the stucco on the home. The evidence before the jury indicates that Sun spent approximately $21,550 before closing in an effort to repair the problems Riley identified with the stucco on the home. Several months after the Hugheses purchased the property, Territo saw the home again. According to Territo, the repairs that he saw "[l]ooked like somebody put a band-aid on a bullet wound[,]" and he described the repairs as a "patch-and-coverup job of all the existing conditions that were done improper[ly]." The disparity between the bid that Sun received from Territo and the amount that it paid to repair the stucco, together with Territo's description about the repairs that he saw done to the home, is some of the evidence from which the jury could reasonably conclude that Sun knew, at closing, that the repairs it

22

authorized were inadequate to fix the problems that it knew existed. Given the inferences available from the conflicting evidence regarding the parties' respective levels of knowledge on the problems and what had been done to remedy them as of closing, the jury's conclusion that Sun failed to disclose material information that was material to the transaction was not unreasonable.

There was also legally sufficient evidence to support the jury's conclusion that Sun's material nondisclosure of what it knew caused the Hugheses' damages. Riley, Sun's inspector, indicated during her testimony at trial that she would have wanted to have the information found in her reports before deciding to purchase a home. *See Citizens Nat'l Bank*, 142 S.W.3d at 478-79 (noting that "'[m]aterial' information is that which a reasonable person would attach importance to and would be induced to act on in determining his choice of actions in the transaction in question"). Lapp essentially admitted in his testimony that the suit would not have resulted had Riley's first report been disclosed.

Also, the conflicting inferences in the evidence cause us to reject Sun's argument that the Hugheses relied solely on their own inspectors in deciding to purchase the home. First, the Hugheses never testified that they relied solely on their own inspections or their own inspectors in deciding to close on the home. Additionally, the Hugheses testified that they would not have purchased the home

23

had Sun provided them with the information it had about the problems with the stucco on the home. While there is evidence that the Hugheses had knowledge about some of the home's stucco problems, the jury could have reasonably inferred that the Hugheses thought Sun had repaired those problems before closing with the exception of several minor cosmetic items, items they were also led to believe that Sun would fix in the course of completing a punch list of items that Sun agreed to repair after the Hugheses exercised their option to close on the home. In this case, the damage evidence does not indicate that the jury's damage award was based on the items on their punch list. Lynn DeGeorge, the certified stucco inspector the Hugheses hired to inspect their home approximately three months after they closed on the home, testified at trial that the stucco problems that still needed to be repaired related to the original stucco installation. According to DeGeorge, Sun's repairs were of "very poor quality," and he explained that when the stucco was installed, there were a "lot of things that were overlooked or omitted that [he] considered to be contributing factors to some of the damage[.]"

We conclude that the record contains legally sufficient evidence from which the jury could reasonably conclude that Sun's nondisclosures were both material and a producing cause of the Hugheses' damages. *See Kupchynsky v. Nardiello*, 230 S.W.3d 685, 689 (Tex. App.—Dallas 2007, pet. denied) (rejecting seller's

24

causation argument in a DTPA case where there was no evidence that buyer relied solely on the opinion of his inspector in purchasing a home where problems related to leaks were more extensive than the problems identified by the buyer's inspector); *Kessler v. Fanning*, 953 S.W.2d 515, 519 (Tex. App.—Fort Worth 1997, no pet.) (rejecting seller's argument that buyer's inspection report was an intervening factor that broke the causal connection where the evidence showed the buyer relied on several factors, including the seller's honesty in presenting the property). The evidence shows that Sun possessed superior information about the nature and extent of the stucco problems and the repairs needed to fix them. *See Bernstein v. Thomas*, 298 S.W.3d 817, 822-23 (Tex. App.—Dallas, no pet.) (affirming judgment in favor of buyer based on seller's failure to disclose report recommending foundation repair when both parties were aware of floor slope but only seller was aware of the extent of the repairs needed to remedy the problem). Considering the entire record, the evidence allowed the jury to reasonably conclude that a causal connection existed between Sun's failure to fully disclose what it knew about the stucco repairs that were still needed at closing, the Hugheses' decision to close on the home, and the Hugheses' damages. *See Honaker*, 192 S.W.3d at 619-20. We overrule all of the legal sufficiency arguments that Sun has advanced in issue two.

25

In issue three, Sun argues the Hugheses agreed in the Rule 11 agreement to release the claims on which the jury's DTPA finding is based. Essentially, Sun contends it is entitled to have the Rule 11 agreement enforced. But, under the Rule 11 agreement, Sun promised to provide the Hugheses with certain repairs and to provide a homeowner warranty in consideration for the Hugheses' agreement to release their claims. And, the jury found that Sun failed to comply with its obligations under the Rule 11 agreement, a finding that is supported by the record. The evidence before the jury allowed the jury to conclude that after closing, Sun failed to fully complete the punch list and to provide the Hugheses the 2-10 warranty referenced in the Rule 11 agreement.

Viewed in the light most favorable to the jury's verdict, we conclude the evidence allowed the jury to reasonably conclude that Sun had breached the parties' Rule 11 agreement. *See Roberts v. Clark*, 188 S.W.3d 204, 209 (Tex. App.—Tyler 2002, pet. denied) ("A breach of contract occurs when a party fails or refuses to perform an act that it expressly promised to do."); *see also City of Keller*, 168 S.W.3d at 827. Moreover, even had the Hugheses signed a release, the Rule 11 agreement only required the Hugheses to release their "known claims." *See D.R. Horton-Texas, Ltd. v. Savannah Properties Assocs., L.P.*, 416 S.W.3d 217, 226 (Tex. App.—Fort Worth 2013, no pet.) ("Claims not clearly within the

26

subject matter of the release are not discharged, even if those claims exist when the release is executed.").

Because the jury found that Sun breached the Rule 11 agreement, the Hugheses were excused from performing their obligation under the agreement to sign a release of their known claims. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."). Additionally, the trial court's judgment creates an implied finding that the stucco problems that existed at closing were not "known claims" at closing. *See* Tex. R. Civ. P. 299 (Omitted Findings). Because the record contains evidence that allowed the jury to reasonably conclude that Sun had breached the Rule 11 agreement, and because the evidence allowed the factfinder to conclude that the stucco problems at closing were not known to the Hugheses when the parties closed on the home, we reject the legal sufficiency arguments advanced by Sun in issue three.

Analysis — Responsible Third Parties

In issue one, Sun argues that it should receive a new trial because the trial court erred when it denied Sun's requests to designate several entities and individuals as responsible third parties: Sonrise Homes, Inc., Shamrock Stucco and

27

Construction, Alpine Air, Inc., Sullivan, Stevens, Henry, Oggero & Associates, Inc., John Loudermilk, and Iron Access. *See* Tex. R. Civ. P. 38 (Third-Party Practice). We review the trial court's decision denying Sun's motion to designate Shamrock Stucco as a responsible third party for abuse of discretion. *See MCI Sales & Serv., Inc. v. Hinton*, 272 S.W.3d 17, 35 (Tex. App.—Waco 2008), *aff'd*, 329 S.W.3d 475 (Tex. 2010); *see also In re Unitec Elevator Servs. Co.*, 178 S.W.3d 53, 58 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding); *In re Arthur Anderson LLP*, 121 S.W.3d 471, 483-85 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding).

According to Sun, the jury should have been asked to apportion the responsibility for the damages the Hugheses recovered between it and "the homebuilder, the designer, the inspector, the stucco contractor, the HVAC contractor, and the ironworks contractor." However, no apportionment issue was submitted to the jury because the trial court denied Sun's pretrial motions asking the trial court to designate these various individuals and entities as responsible third parties.

The Hugheses argue that any error with respect to the trial court's rulings regarding these designations was harmless. According to the Hugheses, Sun was not harmed by the trial court's ruling because it may still sue these individuals and

entities for contribution. They also argue that Sun could have avoided any harm it suffered had it joined the individuals and entities to the case as third-party defendants. *See* Tex. R. App. P. 44.1(a) (*Standard for Reversible Error*); *see Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 210 (Tex. 1999) (explaining that a claim for indemnity accrues when the defendant's "liabilities become fixed and certain by judgment"). Alternatively, the Hugheses contend that the affirmative finding on the DTPA issue resulted solely from Sun's nondisclosures, and not any nondisclosures of the responsible third parties that Sun sought to designate. The Hugheses conclude that alleged error, if any, from the trial court's rulings on Sun's motions to designate were harmless.

That Sun had a right to seek contribution by joining other defendants, however, does not mean it cannot show that it was harmed by the trial court's rulings on the motions at issue. Contribution is a claim for damages, and generally, the third-party plaintiff joins the contribution defendant as a party to the suit. *See* Tex. R. Civ. P. 38. While the Rules of Civil Procedure allow defendants to seek contribution, the right to designate responsible third parties is statutory and does not require the defendant to join the responsible third party to the suit. Tex. Civ. Prac. & Rem. Code Ann. § 33.004(a) (West Supp. 2014) ("A defendant may seek

to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party.").

In DTPA cases, by statute, defendants have the right to designate others as responsible third parties. *Id.* § 33.002(a)(2) (West 2008). The motion to designate a responsible third party must be filed "on or before the 60th day before the trial date unless the court finds good cause to allow the motion to be filed at a later date." *Id*. § 33.004(a). A "[r]esponsible third party" is defined as follows:

> [A]ny person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these.

*Id.* § 33.011(6) (West 2008). A defendant may designate a responsible third party even though the third party has defenses to liability, cannot be joined as a third-party defendant, and is not liable to the parties who are involved in the suit. *See Galbraith Eng'g Consultants, Inc. v. Pochucha*, 290 S.W.3d 863, 868-69 (Tex. 2009). We conclude that the statute governing a defendant's right to identify responsible third parties creates a right to do so that does not depend on a defendant's ability to join others on claims for contribution. We are not persuaded by the Hugheses argument that Sun was required to join others as parties to demonstrate harm when the trial court's ruling deprived Sun of a statutory right it

30

was given to pursue a strategy that did not require that it join others as parties to the suit. Additionally, the Hugheses could have just as easily avoided any question of harm by agreeing to Sun's motions to designate the responsible third parties at issue. In our opinion, Sun preserved its right to complain of the trial court's alleged error by filing timely motions to designate several individuals and entities as responsible third parties and by obtaining rulings on its requests. *See* Tex. R. App. P. 33.1(a).

We are also not persuaded by the Hugheses' argument that all of their damages are attributable solely to Sun's nondisclosures. The Legislature, through Chapter 33 of the Civil Practice and Remedies Code, enacted legislation that allows juries to apportion the responsibility for the damages between "each person's causing or contributing to cause *in any way* the harm for which recovery of damages is sought[.]" Tex. Civ. Prac. & Rem. Code Ann. § 33.003(a) (emphasis added). With respect to the stucco installer, for example, the evidence before the jury would have allowed the jury to apportion some of the fault for repairing the stucco to the entity that installed the stucco on the home. The alleged problems with the installation, on this record, were clearly caused or contributed in some way to the damages the jury awarded for the cost of repairing the stucco on the home.

31

To demonstrate that the trial court erred in its rulings and that Sun was harmed by the rulings, Sun must show that it filed a timely motion to designate the others it sought to designate as responsible third parties, and that had a proportionate responsibility issue been submitted, the jury, in all likelihood, would have decided to apportion fifty percent or more of the responsibility for the damages awarded by the jury to the others. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.013(a), (b)(1) (providing that a defendant is jointly and severally liable for the claimant's damages if "the percentage of responsibility attributed to the defendant with respect to a cause of action is greater than 50 percent"). To assess whether the trial court's rulings harmed Sun, we first assess whether Sun was harmed by the trial court's decision to deny Sun's motion to designate the stucco installer, Shamrock Stucco, as a responsible third party.

The record shows that Sun's request to designate Shamrock Stucco as a responsible third party was timely. *See* Tex. Civ. Prac. & Rem. Code Ann. § 33.004(a). When a defendant files a timely motion, Chapter 33 provides that "[a] court shall grant leave to designate the named person as a responsible third party unless another party files an objection to the motion for leave on or before the 15th day after the date the motion is served." *Id.* § 33.004(f) (West Supp. 2014). The Hugheses did not file a timely objection to Sun's motion to designate Shamrock

32

Stucco as a responsible third party. We conclude the trial court erred by denying Sun's timely request to designate Shamrock Stucco as a responsible third party. *See id.*; *In re Smith*, 366 S.W.3d 282, 287 (Tex. App.—Dallas 2012, orig. proceeding) (noting that "[u]nder [section 311.016(2)[4] of] the Code Construction Act, the word 'shall' 'imposes a duty' unless context necessarily requires a different meaning or express statutory text provides otherwise").

We are also persuaded that, based on the evidence before the jury, the jury would likely have found the stucco installer responsible for the majority of the damages the jury awarded to correct the stucco problems on the Hugheses' home. The jury awarded $647,613 in actual damages, but the jury's award included expenses for repairing a number of items that are unrelated to the stucco on the home. Nonetheless, the evidence before the jury indicated that it would cost $407,232 to replace the stucco on the home. Given the evidence on the amount needed to repair the stucco, the amount the jury decided to award in actual damages, and the evidence in the record tending to show that the stucco installer bore significant responsibility for the problems that required repair, we hold that the trial court's error likely resulted in a judgment against Sun that made it pay an amount for which it would not have been required to pay had the jury been asked

---

[4]Tex. Gov't Code Ann. § 311.016(2) (West 2013).

33

to answer an issue that apportioned the damages that stemmed from the stucco installation between Sun and Shamrock Stucco.

We conclude the trial court's decision to deny Sun's request to designate Shamrock Stucco as a responsible third party was harmful. *See* Tex. R. App. P. 44.1(a)(1). We further conclude that the error prevented Sun from properly presenting its case on appeal by depriving it of the ability to conclusively show that the jury would have answered an apportionment issue that would cast it in judgment for an amount that differs from the amount it must pay under judgment the trial court rendered. *See id.* 44.1(a)(2); *see also In re Broker Logistics, Ltd.*, 320 S.W.3d 402, 408 (Tex. App.—El Paso 2010, orig. proceeding); *In re Arthur Anderson LLP*, 121 S.W.3d at 485-86.

Sun argues that it is entitled to a retrial as to all parties and all issues due to the trial court's error. Under the circumstances, we agree that the proper remedy is to remand the case for another trial. On retrial, given that a new trial date is required, we assume that a new docket control order will be entered, and that the new docket control order will designate and control the date Sun will be required to file its motions designating others as responsible third parties. The Hugheses will then have an opportunity to object to Sun's motions. Because another trial is required, evaluating the trial court's remaining rulings regarding the other

34

responsible third parties is unnecessary, given our conclusion that Sun was harmed by the trial court's decision denying Sun's request as to Shamrock Stucco. Therefore, we need not reach Sun's remaining arguments in issue one,[5] nor do we need to reach the other arguments that Sun has advanced in its other issues. *See* Tex. R. App. P. 47.1. Because the trial court erred in denying Sun's request to designate Shamrock Stucco as a responsible third party and its error was harmful, the judgment is reversed, and the case is remanded on all issues for a new trial.[6]

REVERSED AND REMANDED.

_____
HOLLIS HORTON
Justice

Submitted on November 21, 2013
Opinion Delivered September 25, 2014

Before McKeithen, C.J., Kreger and Horton, JJ.

---

[5]With respect to Sun's requests to designate Sonrise Homes, Inc., Alpine Air, Inc., and Sullivan, Stevens, Henry, Oggero & Associates, Inc., as responsible third parties, the record shows that Sun's requests were timely and that the Hugheses' objections were untimely.

[6]We also need not address the Hugheses' cross-point challenging the trial court's failure to submit a jury question, as the resolution of that issue would not result in any greater relief. *See* Tex. R. App. P. 47.1.

## DISSENTING OPINION

I would sustain issue two in part, and reverse the jury's decision finding that Sun's failure to disclose Rhondalyn Riley's March 2008 Stucco Report was a producing cause of the Hugheses' damages.

A failure to disclose material information requires that the defendant knew the information, intentionally failed to bring it to the plaintiff's attention, and withheld the information with the intent of inducing the consumer to engage in a transaction. *Doe v. Boy Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 479 (Tex. 1995); *Willowbrook Foods, Inc. v. Grinnell Corp.*, 147 S.W.3d 492, 507 (Tex. App.—San Antonio 2004, pet. denied). Information is material if a reasonable person would attach importance to the information and would be induced to act on it when determining his choice of actions. *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Fort Worth 2004, no pet.). The plaintiff must establish that the defendant's action was a substantial factor that brought about the plaintiff's injury and without which the injury would not have occurred. *Doe,* 907 S.W.2d at 481.

At trial, Stuart Lapp admitted that the Hugheses did not see Riley's March 2008 stucco report before closing, but he testified that he did not know the report existed. However, Pamela Brand, a Sun representative, testified that she had told

36

Lapp about Riley's March report. According to the record, Lapp subsequently told the Hugheses that he was unaware of an initial report. Lapp explained that Sun was not under contract with the Hugheses when Riley authored the March report and that once the parties reached an agreement, Sun furnished Riley's more recent June report. Lapp told the Hugheses that, although he had not seen the June report, it did not identify problems with the stucco.

Riley testified that the property was not functioning as intended in March and that, as a buyer, she would want to "know that the stucco or that the property is functioning as intended." Lapp and Kirk Harrington testified that the June report reflected that items on the March report had been cured. John Cook, Sun's president, testified that he saw no purpose for furnishing the March report. Larry and Susan both testified that they never would have closed had they received Riley's March report. Lapp also admitted that "we wouldn't be here[]" had the report been produced.

Larry admitted that he was aware of moisture issues before closing and had concerns about moisture penetration during construction. According to the record, as early as 2007, Guffin Construction issued a report identifying the potential for future leaks and moisture intrusion, as well as the presence of mold and leaks. In January 2008, at the Hugheses' request, the Hugheses' realtor provided the

Hugheses with the name of a moisture detection service. In early March 2008, Genesis Restoration and Cleaning conducted thermal imaging, which revealed possible moisture, the potential for moisture damage in the near future, and the need for probing with a moisture meter to determine the moisture content. After Sun made repairs, Island Home Inspections identified problems such as water stains, possible water damage, inadequate insulation, substandard construction, leaks, excessive condensation, and damaged ductwork. According to the report, certain areas needed to be sealed to prevent moisture problems, the "A/C systems in the west attic [were] condensating at an abnormal rate[,]" and "[d]ucts in contact with each other [were] sweating sufficiently to drip on the flooring." Before closing, Island Home Inspections issued a re-inspection report and found that an ongoing "excessive condensation problem" existed, that attempts to alleviate the problem did not appear to address the root cause, that the failure to remedy the problem could prove costly, and that the stucco was an ongoing project.

The record demonstrates that, before closing and even without Riley's March report, the Hugheses knew that the home had a history of moisture issues, that the repairs Sun made had not cured the moisture issues, that the moisture issues were serious and ongoing, and that failure to remedy the issues could prove costly. Because the Hugheses received information indicating that Sun's repairs

38

were inadequate to remedy the moisture issues, we reject the Hugheses' contention that Sun's failure to disclose the report amounts to nondisclosure of the extent and nature of repairs. Sun could not be held liable for failing to disclose information about moisture issues when the Hugheses had actual notice of those issues. *See Gill v. Boyd Distrib. Ctr.*, 64 S.W.3d 601, 604 (Tex. App.—Texarkana 2001, pet. denied). Viewing the evidence in the light most favorable to the jury's verdict, the evidence presented at trial would not enable reasonable and fair-minded people to find that Sun's failure to disclose Riley's March 2008 stucco report was a producing cause of the Hugheses' damages.[7] *See Doe*, 907 S.W.2d at 481; *see also Gill*, 64 S.W.3d at 604. For these reasons, I would sustain issue two in part and not reach Sun's factual sufficiency challenge. *See* Tex. R. App. P. 47.1.

_____
Steve McKeithen
Chief Justice

Dissent Delivered
September 25, 2014

---

[7]The Hugheses contend that Sun's actions amount to more than mere non-disclosure and constitute active concealment. However, the record does not indicate that the Hugheses pleaded active concealment, or presented that issue to the jury.